05cv17734-PostJmtOrd.wpd

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| **CURT & NANCY COOLEY,** | : | **Case No.  1:05-CV-17734** |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **LINCOLN ELECTRIC CO., et al.,** | : | |
| | : | **Judge Kathleen M. O'Malley** |
| **Defendants** | : | |
| | : | |
| | : | <u>**MEMORANDUM & ORDER**</u> |
| | : | |

This products liability action was brought by Curt and Nancy Cooley against four manufacturers of welding rods: (1) Lincoln Electric Company; (2) Hobart Brothers Company; (3) The ESAB Group, Inc.; and (4) BOC Group, Inc. f/k/a Airco, Inc.

The case was assigned to the undersigned as related to the Multidistrict Litigation ("MDL") known as *In re Welding Fumes Products Liability Litigation*, case no. 03-CV-17000, MDL no. 1535. The case proceeded to trial and the jury returned a verdict finding defendants liable to Curt Cooley.[1] The jury awarded $1.25 million in compensatory damages, but allocated 37% of fault to Cooley.[2]

---

[1]  The jury did not find liability with respect to Nancy Cooley's only claim, loss of consortium.  Nancy Cooley has not filed a post-judgment motion challenging that finding, so Curt Cooley is the only plaintiff affected by the post-judgment motions now pending.

[2]  As a result, the total compensatory damage award was reduced to $787,500.  Each defendant's individual liability for compensatory damages is governed by a joint-defense agreement.

The jury also awarded $5 million in punitive damages, allocated against the defendants as follows: ESAB, $1.75 million; Hobart, $1.75 million; Lincoln, $750,000; and BOC, $750,000.

The parties then filed several post-judgment motions.  For the reasons explained below, the Court rules on these motions as follows.

- Defendants' renewed motion for judgment as a matter of law on plaintiffs' punitive damages claim or, in the alternative, for reduction of the punitive damages awards (docket no. 258) is **DENIED**.

- Plaintiff's motion for attorneys' fees and expenses (docket no. 255) is **DENIED**, and defendants' motion for leave to file surreply (docket no. 269) is **DENIED AS MOOT**.

- Defendant BOC's renewed motion for judgment as a matter of law (docket no. 256) is **DENIED**.

- Defendants' renewed motion for judgment as a matter of law on plaintiffs' aiding and abetting claims (docket no. 257) is **DENIED**.

- Plaintiff's motion to tax costs (docket no. 253) is **GRANTED, in part**, and the Court awards $60,964.79 in costs to Cooley.

## I.    BACKGROUND

### A.    BRIEF FACTUAL BACKGROUND

The pertinent evidence presented at trial is summarized in the punitive damages section below; what follows is a brief introduction of the factual basis for Cooley's claims.

Cooley was born in Iowa in 1951, and currently lives there.[3]  He learned how to arc weld from his father when he was 16 years old.[4]  After he graduated from high school in 1969, Cooley took a one year course on auto body repair at a vocational school and received his first formal welding instruction.  Throughout the 1970s, Cooley worked in various auto body shops.  The body

---

[3] *See* trial tr. at 717:10-14; 715:25.

[4] *Id*. at 719:4-8.

shops routinely used arc welding to repair cars, and welding was part of Cooley's job.[5]  In 1979, Cooley decided to make a career change and entered the ironworking trade, where he continued to weld as part of his job.[6]  He was a union ironworker until the late 1980s, when the work dried up and he went back to the auto body business for a few years.  He returned to ironworking in 1990, and spent the rest of his working life in that trade – i.e., until 2004.[7]  At times during his career, Cooley was a foreman or supervisor, but he still welded while holding those positions.[8]

In addition to welding as part of his job, Cooley welded outside of work.[9]  He occasionally bought wrecked cars and repaired them in his garage, and over the years, did artwork with metal that required welding.[10]

The last time Cooley welded was January 10, 2003.[11]

Although defendants dispute the diagnosis, Cooley has been diagnosed with manganese poisoning.[12]  This disease causes a movement disorder in the same family of disorders as Parkinson's Disease, but it is "defined by its cause: overexposure to manganese."[13]  Manganese is a heavy metal

---

[5]  *Id*. at 720:5-721:9.

[6]  *Id*. at 723:7-9; 726:4-5.

[7]  *Id*. at  726:1-729:12.

[8]  *Id*. at  740:9-21.

[9]  *Id*. at 730:21-731:20.

[10]  *Id*. at 731:1-20; 734:23-735:25.

[11]  *Id*. at  719:23; 763:13-16.

[12]  *Id*. at 368:11-24; 476:23-477:12.  Manganese poisoning is sometimes referred to as Manganese Induced Parkinsonism ("MIP") or manganism.

[13]  *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 668 (6th Cir. 2010).

contained in welding consumables, i.e., welding rods and wires.  The process of joining steel by welding generally involves melting a welding consumable to fuse together two pieces of metal. Welding consumables give off fumes that contain manganese.  In this case, Cooley alleges he has neurological injuries caused by inhaling welding fumes that contain manganese.[14]  He describes his injuries as follows:[15]

> I have balance problems.  I have tremors.  I have slower movements than I used to have.  I'm impotent.  I'm on depression – I'm depressed.  I ache all over.  I'm constantly fatigued.  I can't sleep at all, very little at night.  And I have problems with my memory.

The essence of Cooley's lawsuit is that defendants, manufacturers of welding consumables, knew inhaling welding fumes presented the risk of irreversible neurological injury, but failed to adequately warn Cooley of that risk.

### B.    PROCEDURAL HISTORY

After this case became part of the *Welding Fumes* MDL, the parties consented to this Court presiding over the trial.  As described above, the jury returned a verdict for Cooley, ultimately awarding $787,500 in compensatory damages and $5 million in punitive damages.  The post-judgment motions now pending before the Court challenge these jury verdicts.

The standard of review for each of the substantive motions is discussed below.  Because the Court's ruling on certain of the motions could impact its consideration of others,[16] the Court

---

[14]  *See* First Amended Complaint, docket no. 15.

[15]  Trial tr. at 765:9-13.

[16]  For instance, the standard for recovery of attorneys' fees and expenses is higher than the standard for recovery of punitive damages.  Cooley cannot recover attorneys' fees and expenses, therefore, unless the Court also upholds the punitive damages award.  Similarly, the evidence pertinent to resolving defendants' punitive damages motion informs the Court's analysis of defendants' aiding and abetting motion, and of BOC's motion for judgment as a matter of law. Accordingly,

-4-

addresses the pending motions in this order: (1) defendants' punitive damages motion; (2) Cooley's motion for attorneys' fees and expenses; (3) BOC's motion for judgment as a matter of law; and (4) defendants' aiding and abetting motion.  Last, the Court addresses Cooley's motion to tax costs.

## II.   **DEFENDANTS' PUNITIVE DAMAGES MOTION**

### A.   **PROCEDURAL HISTORY**

In his complaint, Cooley asserted entitlement to punitive damages.[17]  Prior to trial, defendants moved for summary judgment on Cooley's punitive damages claim.  The Court addressed and denied defendants' motion at a pretrial hearing.[18]  During the trial, defendants made an oral motion pursuant to Rule 50(a) of the Federal Rules of Civil Procedure for judgment as a matter of law with respect to the punitive damages claim.[19]  The Court denied that motion.[20]  Defendants renewed their Rule 50(a) motion at the close of the evidence.[21]  Again, the Court denied defendants' motion and submitted the punitive damages claim to the jury.[22]  After the jury returned its verdict, defendants again renewed their motion for judgment as a matter of law with respect to punitive damages, this time pursuant to Rule 50(b) of the Federal Rules of Civil Procedure.[23]  It is

---

[17]  First Amended Complaint, docket no. 15 at 26 (eighth claim).

[18]  *See* pre-trial tr. at 35:23-40:3 (Sept. 1, 2009).

[19]  *See* trial tr. at 1842:8-1845:7 (Sept. 23, 2009).

[20]  *Id*. at 1854:5-23.

[21]  *See* docket no. 237; trial tr. 3097:14-3098:8 (Oct. 1, 2009).

[22]  *See* trial tr. at 3097:22-3098:8.

[23]  *See* docket no. 258, defendants' renewed motion for judgment as a matter of law on plaintiffs' punitive damages claim or, in the alternative, reduction of the punitive damages award.

this motion that is now pending.[24]

## B.   THE STANDARD FOR RULE 50 MOTIONS FOR JUDGMENT AS A MATTER OF LAW

Federal Rule of Civil Procedure 50(a)(1) states that, "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue," then the court may "grant a motion for judgment as a matter of law against the party on a claim or defense that, under controlling law, can be maintained or defeated only with a favorable finding on that issue."  A party may move for judgment as a matter of law at any time before the case is submitted to the jury.[25]  If the Court denies the Rule 50(a) motion made during trial, as did the undersigned in this case, "the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion."[26]  The movant may then "renew its request for judgment as a matter of law by filing a motion no later than 10 days after the entry of judgment."[27]  Defendants timely filed their motion for judgment as a matter of law with respect to punitive damages pursuant to Rule 50(b).  After a verdict is returned, the Court may rule on a renewed Rule 50(b) motion by: (a) allowing the judgment to stand, (b) ordering a new trial, or (c) directing entry of judgment as a matter of law.[28]

Subject-matter jurisdiction in this case is based upon diversity of citizenship.  The parties

---

[24]  *See* docket nos. 258, 266, 272.

[25]  Fed. R. Civ. P. 50(a)(2).

[26]  Fed. R. Civ. P. 50(b).

[27]   Fed. R. Civ. P. 50(b).  Rule 50(b) also provides that "[t]he movant may alternatively request a new trial or join a motion for a new trial under Rule 59."  *Id*.  The defendants did not request a new trial in this case.

[28]  Fed. R. Civ. P. 50(b).

agree that, in the Sixth Circuit, "state law governs the standard for granting motions for directed verdicts and judgments notwithstanding the verdict" in diversity cases.[29]  Hence, Iowa law provides the applicable standard for a motion for judgment as a matter of law filed under Rule 50.[30]

Iowa courts apply the "substantial evidence" standard for judgment as a matter of law.  That is, judgment as a matter of law is *not* appropriate if there is substantial evidence to support each element of the plaintiff's claim.[31]  "Evidence is substantial if a jury could reasonably infer a fact from the evidence."[32]  In evaluating a motion for judgment as a matter of law, the Court must construe the evidence "in the light most favorable to the nonmoving party."[33]  "This is so regardless of whether the evidence was contradicted."[34]  Thus, the Court will afford Cooley "every legitimate inference that can be reasonably drawn from the evidence."[35]  Indeed, "Iowa courts generally defer to a jury's award of punitive damages."[36]  Although a different fact-finder might reach a different

---

[29]  *See* docket no. 258 at 7 (citing *Mannix v. County of Monroe*, 348 F.3d 526, 532 (6th Cir. 2003) (internal citations and quotations omitted)); docket no. 266 at 4-5; *see also Potti v. Duramed Pharms., Inc.*, 938 F.2d 641, 645 (6th Cir. 1991).  The Sixth Circuit follows the minority rule in this regard.  *Mannix*, 348 F.3d at 532.  In the majority of circuits, federal law governs the standard for granting a Rule 50 motion for judgment as a matter of law, even in diversity cases.  *Id.* (citing, *e.g.*, *John Hancock Mut. Life Ins. Co. v. Dutton*, 585 F.2d 1289, 1292 (5th Cir. 1978)).

[30]  *See* docket no. 258 at 7; docket no. 266 at 4-5.

[31]  *See St. Paul's Evangelical Luthern Church v. City of Webster City*, 766 N.W. 2d 796, 798 (Iowa 2009).

[32]  *Balmer v. Hawkeye Steel*, 604 N.W.2d 639, 640-41 (Iowa 2000).

[33]  *Top of Iowa Co-op. v. Sime Farms, Inc.*, 608 N.W.2d 454, 466 (Iowa 2000).

[34]  *Fed. Land Bank of Omaha v. Woods*, 480 N.W.2d 61, 65 (Iowa 1992) (citing *Larsen v. United Fed. Sav. & Loan Ass'n*, 300 N.W.2d 281, 283 (Iowa 1981)).

[35]  *Id.*; *see also McClure v. Walgreen Co.*, 613 N.W.2d 225, 230 (Iowa 2000).

[36]  *Pulla v. Amoco Oil*, 882 F.Supp. 836, 874 (S.D. Iowa 1994) (quoting *Rees v. O'Malley*, 461 N.W.2d 833, 839 (Iowa 1990)), *rev'd in part on a separate issue*, 72 F.3d 648 (8th Cir. 1995).

conclusion, the Court must uphold the jury's verdict if reasonable minds could disagree as to whether substantial evidence supported Cooley's punitive damages claim.[37]

### C.    IOWA LAW REGARDING PUNITIVE DAMAGES

The Court's review of the jury's punitive damages award involves two separate inquiries: (1) whether the record contains substantial evidence showing defendants' conduct was sufficiently egregious to support an award of punitive damages pursuant to Iowa law; and (2) if so, whether the size of the punitive damages award is constitutionally appropriate.[38]

### 1.    The Iowa Punitive Damages Statute

In Iowa, statutory law provides that punitive damages may be awarded only where the plaintiff shows, "by a preponderance of clear, convincing, and satisfactory evidence, the conduct of defendant from which the claim arose constituted willful and wanton disregard for the rights or safety of another."[39]  Willful or wanton conduct occurs when

> an actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences.[40]

In other words, Iowa law permits punitive damages when the plaintiff presents clear and convincing evidence that defendant acted with actual or legal malice.[41]  Cooley did not argue that defendants

---

[37] *See Ezzone v. Riccardi*, 525 N.W.2d 388, 391 (Iowa 1994); *Woods*, 480 N.W.2d at 65 (explaining "if reasonable minds could differ on the issue, it is proper to submit it" to the jury).

[38] *See Ezzone*, 525 N.W.2d at 398.

[39] Iowa Code § 668A.1(1)(a).

[40] *Kiesau v. Bantz*, 686 N.W.2d 164, 173 (Iowa 2004) (quoting *Vlotho v. Hardin County*, 509 N.W.2d 350, 356 (Iowa 1993)); *see also Van Sickle Constr. Co. v. Wachovia Commercial Mortgage, Inc.*, 783 N.W.2d 684, 689 (Iowa 2010) (quoting *Kiesau*, 686 N.W.2d at 173).

[41] *Cawthorn v. Catholic Health Initiatives Iowa Corp.*,  743 N.W.2d 525, 529 (Iowa 2007).

acted with actual malice; rather, Cooley argued only that defendants acted with legal malice, which "may be shown by wrongful conduct committed with a willful or reckless disregard for the rights of another."[42]

2.    **Comparison with the Mississippi Standard for Punitive Damages Applied in _Jowers_**

The legal standard for imposition of punitive damages varies from state to state.  The parties disagree regarding whether Iowa's legal malice standard is higher than the Mississippi standard the Court applied in another MDL case, _Jowers v. BOC Group, Inc._[43]  The parties debate this question vigorously because the issue is relevant within the broader context of this multidistrict litigation.  Most of the evidence of defendants' conduct will be the same in every MDL case, and defendants do not claim the evidence presented by Cooley on this issue was meaningfully different from the evidence presented in _Jowers_.  The availability of punitive damages arising from defendants' conduct in a given case within the MDL depends, therefore, upon each state's approach to punitive damages.  Thus, if the Court finds the evidence sufficient to sustain a punitive damages award under

---

[42]  _Wolf v. Wolf_, 690 N.W.2d 887, 893 (Iowa 2005) (quoting _Jones v. Lake Park Care Ctr., Inc._, 569 N.W.2d 369, 378 (Iowa 1997)); _see also Van Sickle Constr. Co._, 686 N.W.2d at 689-90 (quoting _Wolf_, 690 N.W.2d at 893).  Cooley has not argued actual malice, nor is there substantial evidence to support a finding of actual malice.

[43]  608 F. Supp. 2d 724 (S.D. Miss. 2009), _aff'd as to liability, vacated as to damages_, 617 F.3d 346 (5th Cir. 2010).  In _Jowers_, the undersigned was temporarily designated to the Southern District of Mississippi in order to preside over the trial.  _See Jowers_, No. 1:08 CV 0036, docket no. 136, exh. D; 28 U.S.C. §292(d).  The plaintiff prevailed at trial and the jury awarded compensatory and punitive damages.  This Court denied defendants' post-judgment motions, including a motion for judgment as a matter of law regarding punitive damages.  On appeal, the Fifth Circuit upheld this Court's judgment, with the exception of a jury instruction on the joint-tortfeasor defense.  _Jowers v. Lincoln Elec. Co._, 617 F.3d 346 (5th Cir. 2010).  As a result, the Fifth Circuit affirmed the judgment of liability, but vacated the damages award and remanded for retrial on compensatory and punitive damages.  _Id_. at 360.  In so holding, the Fifth Circuit did not reach the issue of punitive damages.

one state's law, that conclusion normally would compel a similar finding under the law of any other state with the same or less strict legal standards for an award of punitive damages.

All but two states allow punitive damages, but the degree of culpability to justify an award varies from state to state.[44]  For instance, one commentator divides states into four "general categories" –  those requiring (1) malice; (2) conduct that does not rise to the level of malice but exceeds gross negligence; (3) gross negligence; or (4) satisfaction of certain statutory elements.[45]  These categories provide only rough guidance, however; in practice, one state's definition of "malice" or "gross negligence" is not necessarily the same as another's.  The same conduct could conceivably be labeled "gross negligence" in state A and "malice" in state B.   Because the Court found that the defendant's conduct could support a jury award of punitive damages under Mississippi law in *Jowers*, the Court compares the law cited in *Jowers* to relevant Iowa law.

The Mississippi statute the Court applied in *Jowers* states:

> Punitive damages may not be awarded if the claimant does not prove by clear and convincing evidence that defendant against whom punitive damages are sought acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud.[46]

The applicable Iowa punitive damages statute requires the jury to decide:

> Whether by a preponderance of clear, convincing, and satisfactory evidence, the conduct of defendant from which the claim arose constituted willful and wanton disregard for the rights or safety of another.[47]

---

[44]  *See* Lori S. Nugent, Robert W. Hammesfahr, & Richard L. Blatt, *Punitive Damages: A State-By-State Guide to Law and Practice* § 3:2 (2009 ed.).  Nebraska and Washington do not permit recovery of punitive damages.  *Id.*

[45]  *Id.*

[46]  Miss. Code. 11-1-65(1)(a).

[47]  Iowa Code § 668A.1(1)(a).

-10-

Parsing these statutes, the first similarity is the burden of proof:  clear and convincing evidence is required in both Iowa and Mississippi.  The necessary degree of culpability, however, appears to differ.  The Mississippi statute describes a range of culpable conduct, including three alternatives: (1) "actual malice;" *or* (2) "gross negligence which evidences a willful, wanton, or reckless disregard for the safety of others;" *or* (3) "actual fraud."[48]  In contrast, there are no alternatives in the Iowa statute: it requires conduct constituting "willful and wanton disregard for the rights or safety of another."

Whether these statutory distinctions translate into meaningfully different legal standards must be resolved by reference to case law applying the respective phrases.  Both statutes refer to conduct in "disregard for the safety of others."  In Iowa, the disregard must be "willful and wanton" to support a punitive damages award.  In Mississippi, the disregard can be "willful, wanton, *or* reckless."  Based solely on the language of the statutes, it would appear the minimum *mens rea* is less in Mississippi than in Iowa – *reckless disregard* in Mississippi versus *willful and wanton disregard* in Iowa.  But Iowa case law eviscerates this apparent distinction.  The Iowa Supreme Court has consistently conflated "willful and wanton" disregard and "legal malice," and defined "legal malice" as "wrongful conduct committed with a willful *or reckless* disregard for the rights of another."[49]  In other words under Iowa law, as under Mississippi law, a degree of *recklessness* is

---

[48]  In *Jowers*, the Court canvassed Mississippi case law and concluded: "it is the combination of misconduct with a negative *mens rea* that justifies punitive damages [in Mississippi]."  *Jowers*, 608 F.Supp.2d at 744.

[49]  *Van Sickle Constr. Co.*, 783 N.W.2d at 690 (quoting *Cawthorn*, 743 N.W.2d at 529 (quoting *Wolf*, 690 N.W.2d at 893)) (emphasis added).

-11-

sufficient to support an award of punitive damages.[50]  In sum, careful examination of the language

of the Iowa and Mississippi punitive damages statutes, as defined and refined by the respective state

Supreme Courts, reveals the standards are very similar.

Analysis of other Iowa cases with facts similar to this one, more than examination of the

language of the statute, best illustrates the type of conduct the Iowa Supreme Court considers to rise

to the level of a "reckless disregard for the rights of another."[51]  As the Iowa Supreme Court has

stated, "the real issue here is conduct."[52]

### 3.    Case Law Analysis of the Iowa Punitive Damages Standard

The parties understandably focus their attention on just a few Iowa Supreme Court cases.

The defendants rely primarily on *Mercer v. Pittway Corp.*,[53] while Cooley emphasizes the Court's

analysis in *Fell v. Kewanee Farm Equip. Co.*[54]  A third case, *Hillrichs v. Avco Corp.*,[55] links the two.

The plaintiffs in *Mercer* were members of a young family that purchased a model 83R

ionization smoke detector, manufactured by defendant "BRK."  The plaintiffs installed the 83R

smoke detector in their home, but the detector did not alert to a smoldering house fire.  The fire

killed one child and severely injured another.[56] The plaintiffs claimed the product was defective as

---

[50]  *See Pulla*, 882 F.Supp. at 873-82 (discussing the Iowa punitive damages standard in detail).

[51]  *Id.*

[52]  *Beeman v. Manville Corp. Asbestos Disease Comp. Fund*, 496 N.W.2d 247 (Iowa 1993).

[53]  616 N.W.2d 602, 618 (Iowa 2000).

[54]  457 N.W.2d 911, 919 (Iowa 1990).

[55]  514 N.W.2d 94, 100 (Iowa 1994).

[56]  *Mercer*, 616 N.W.2d at 602.

-12-

manufactured, and also asserted BRK failed to warn that an ionization smoke detector might not detect a smoldering fire.  The plaintiffs presented evidence BRK knew its 83R detector was not as effective as photoelectric smoke detectors at detecting smoldering fires, but failed to warn consumers of this fact.[57]

In response, BRK argued that: (1) the 83R detector satisfied the applicable industry standards for performance and construction of smoke detectors; (2) BRK developed and consistently implemented an industry-approved simulation testing protocol to address customer complaints relating to failure of the 83R to alert to smoke;[58] (3) BRK's warning stated that the detector "may not go off or give early warning in as many as 35% of all fires" and  "[s]moke detectors may not sense every kind of fire every time;" and (4) a more specific warning regarding the relative strengths and weaknesses of different kinds of smoke detectors would only confuse consumers.[59]

The Iowa Supreme Court rejected the plaintiffs' punitive damages claim, stating as follows:

> We conclude . . . that plaintiffs generated a jury question on their theories of strict liability and negligence [including failure to warn] as to the effectiveness of ionization smoke detectors, and how the Mercers' smoke detector did, or should have, responded to the fire in their home.  However, we reject plaintiffs' contention that BRK's knowledge of the 83R's failure to alarm in certain types of fires, coupled with BRK's failure to test ionization detectors in real world fires and its failure to

---

[57]    *Id.* at 618, 625.  The Iowa Supreme Court summarized the plaintiffs' defective manufacture theory of liability as follows: "BRK had knowledge that the model 83R was not as effective as a photoelectric smoke detector at alarming to slow, smoldering fires, but yet continued to market the model 83R ionization detector as a sufficient fire detective device." *Id.*  Similarly, the Court explained, the plaintiffs' failure to warn "theory at trial was that BRK had a duty to warn consumers or otherwise give consumers notice that the model 83R ionization smoke detector might fail to alarm in certain types of fires.  Stated in another way, plaintiffs say that defendant had a duty to warn that a photoelectric smoke detector might be more suitable for certain types of fires." *Id.* at 623.

[58]    *Id.* at 611.

[59]    *Id.* at 624-25.

-13-

place a specific warning on the box concerning the 83R's delayed response to certain types of fires, creates a jury question on punitive damages.[60]

In so holding, the Iowa Supreme Court noted that BRK's compliance with industry standards showed "reasonable disagreement over the relative risks and utilities of the conduct and device at issue":

> BRK's adoption of the UL 217 [industry] standard . . . shows a reasonable disagreement over the relative risks and utilities of BRK's conduct in the manufacture and production of the model 83R ionization detector.  *See Hillrichs v. Avco Corp.*, 514 N.W.2d 94, 100 (Iowa 1994) (stating "that an award of punitive damages is inappropriate when room exists for reasonable disagreement over the relative risks and utilities of the conduct and the device at issue").  BRK's experts also testified that the sensitivity level of ionization and photoelectric components in a combination smoke detector are not as sensitive as a stand-alone device to avoid nuisance alarms.  Thus, although a jury could reasonably conclude that BRK was at fault, we do not believe that a rational fact finder could find by clear, convincing, and satisfactory proof a willful and wanton disregard by BRK for the rights of another.  Consequently, the district court erred in submitting plaintiffs' claim of punitive damages to the jury and in overruling BRK's post-trial motion in this regard.  We reverse on this issue.[61]

Notably, while the Iowa Supreme Court did consider defendants' warning when assessing the propriety of punitive damages, the "industry standards" aspect of the decision pertains to the "manufacture and production" of the smoke detector, not the warning.  The relationship between "industry standards" regarding manufacture and production and the adequacy of the warning is, therefore, unclear in the context of the entire *Mercer* opinion.

While defendants highlight *Mercer* in their briefs, Cooley relies on *Fell v. Kewanee Farm Equip. Co.*[62]  Cooley cites *Fell* for the principle that  punitive damages may be based on evidence

---

[60] *Id*. at 618.

[61] *Id*.

[62] 457 N.W.2d 911, 919 (Iowa 1990).

-14-

that a manufacturer knew consumers were being injured by its product, but the manufacturer chose not to act on that knowledge for economic reasons.  In *Fell*, the Iowa Supreme Court set forth the "willful and wanton" standard for punitive damages from Prosser and Keeton: "The actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences."[63]  The *Fell* court then tailored this definition to the products liability arena as follows:

> A legal basis for punitive damages is established in product liability cases where the manufacturer is shown to have knowledge that its product is inherently dangerous to persons or property and that continued use is likely to cause injury or death, but [the manufacturer] nevertheless continues to market the product without making feasible modifications to eliminate the danger or make adequate disclosure and warning of such danger.  *Especially is this so when the evidence is susceptible to the inference that the manufacturer not only refused to warn for the user's protection, but intentionally took steps to cover up the known danger in order to protect continued marketing of the product for its own economic advantage*."[64]

*Fell* underscores the importance, under Iowa law, of whether the manufacturer's reason for disregarding the safety of its customers was in order to preserve or obtain an economic advantage.

The Court in *Hillrichs* included  in its analysis both of the primary considerations identified in *Mercer* and *Fell*.  In *Hillrichs*, the Iowa Supreme Court was addressing a design defect claim.  The plaintiff in *Hillrichs* was a farmer who severely injured his hand while trying to clean out the husking bed of a running cornpicker.  The defendant-manufacturer knew farmers frequently try to clean the husking bed while the cornpicker is on.  Nonetheless, it "decided not to install emergency stop devices on the . . . husker apparatus, . . . bas[ing] their decision on the so called 'dependency

---

[63]  *Prosser and Keeton on Torts* § 34 at 213 (1984).

[64]  *Fell*, 457 N.W.2d at 919 (quoting *Johns-Manville Sales Corp. v. Janssens*, 463 So.2d 242, 249 (Fla. App. 1984) (emphasis added)).

-15-

hypothesis' – that is, the theory that the product as designed would discourage farmers from making contact with the roller bed and that plaintiff's proposed device would invite farmers to unreasonably depend on it, despite the dangerousness of the husking roller bed."[65]

The jury in *Hillrichs* found for the plaintiff and awarded punitive damages, but the trial court set aside the award.  The Iowa Supreme Court upheld the trial court's ruling, reasoning that a reasonable disagreement existed with respect to the manufacturer's husking bed design.[66]  In light of the "dependency hypothesis," the Iowa Supreme Court held that "an award of punitive damages is inappropriate when room exists for reasonable disagreement over the relative risks and utilities of the conduct and device at issue."[67]  In its analysis, however, the Court cited *Fell* and specifically noted that the evidence did not "support an inference that the manufacturer took the position it did for its own economic advantage."[68]

Thus, as in *Mercer*, the Iowa Supreme Court in *Hillrichs* considered a critical factor to be the existence of "reasonable disagreement over the relative risks and utilities of the conduct and

---

[65]  *Hillrichs*, 514 N.W.2d at 100.

[66]  *Id*.

[67]  *Id*. (citing *Burke v. Deere & Co.*, 6 F.3d 497 (8th Cir. 1993); *Larson v. Great West Casualty Co.*, 482 N.W.2d 170, 174 (Iowa App. 1992) (citing *Kehm v. Proctor & Gamble Mfg. Co.*, 724 F.2d 613, 623 (8th Cir. 1983))).

[68]  *Id*.; *see also Burke v. Deere & Co.*, 6 F.3d at 511-12; *Tratchel v. Essex Group, Inc.*, 452 N.W.2d 171, 176 (Iowa 1990) (upholding punitive damages based on evidence that defendant knew of and concealed the harm), *abrogated on another issue by Comes v. Microsoft Corp.*, 775 N.W.2d 302 (Iowa 2009); *cf. J & J Farms, Inc. v. Cargill, Inc.*, 693 F.2d 830 (8th Cir. 1982) (McMillian, J., dissenting) (reasoning that a corn distributor misrepresented or concealed information regarding investigation of corn contamination in order to protect its position in litigation against another customer, and that such conduct supported punitive damages).

device at issue." [69]   Like *Fell*, however, the *Hillrichs* Court only reversed the punitive damages award after considering whether the defendant chose profitability over customer safety.[70]  In other words, *Hillrichs* links *Mercer* and *Fell*; either factor may support a punitive damages award. Consequently, in analyzing defendants' punitive damages motion, there are two particularly relevant considerations: (1) when "room exists for reasonable disagreement over the relative risks and utilities of the conduct . . . at issue," punitive damages are more likely to be inappropriate,[71] and (2) when the manufacturer disregards the safety of its customer in order to preserve or obtain an economic advantage, punitive damages are more likely to be appropriate.[72]

These two specific considerations are not mutually exclusive; they are part of the substantial evidence determination whether, construed in the light most favorable and with all reasonable

---

[69] *Hillrichs*, 514 N.W.2d at 100.  *Hillrichs* is clearly a manufacturing defect case and not a warnings case. While the distinction between design defect cases and failure to warn cases is valid, there is at least one failure-to-warn case in which the court relied, in part, upon a reasonable disagreement regarding the product design to find that defendant's *warning* program could not support a claim for punitive damages.  *See Burke*, 6 F.3d at 512 (reversing punitive damages award because there was no evidence the manufacturer made a calculated decision not to remedy a known warnings issue, and there was reasonable disagreement regarding the effectiveness of a post-sale warnings program). And there is no logical reason to confine the "reasonable disagreement" concept to the manufacture and production realm.  Reasonable disagreement regarding the manufacturer's decisions with respect to the nature and extent of a warning may, therefore, be treated the same way as manufacturing and production decisions.   Accordingly, under Iowa law, a reasonable disagreement with respect to the nature and degree of the risk caused by a product and the adequacy of the associated warning is one consideration in determining whether a punitive damages award is appropriate.  The court in *Burke* also employed the *Fell* consideration: whether there was evidence the manufacturer made a calculated economic decision not to warn.  *Burke*, 6 F.3d at 512.

[70]  *Hillrichs*, 514 N.W.2d at 100 (citing *Fell* and noting evidence did not "support an inference that the manufacturer took the position it did for its own economic advantage.").

[71] *Mercer*, 616 N.W.2d at 618 (quoting *Hillrichs*, 514 N.W.2d at 100).

[72] *Fell*, 457 N.W.2d at 919.

-17-

inferences given to Cooley, there is substantial evidence defendants acted with legal malice.[73]

### D.     ANALYSIS OF THE JURY'S PUNITIVE DAMAGES AWARD

Defendants' punitive damages motion presents two issues: (1) whether an award of punitive damages is justified under Iowa law; and (2) if so, whether the amount of the award is constitutional.

### 1.     Propriety of a Punitive Damages Award

Defendants present three separate arguments why no reasonable jury could find they recklessly disregarded Cooley's and other welders' rights or safety.  First, defendants argue "punitive damages are unavailable under Iowa law because the evidence at trial revealed the existence of a debate in the scientific community surrounding plaintiffs' core allegation – *i.e.*, that manganese in welding fumes causes neurological problems."[74]  Second, defendants argue, "even if the scientific community broadly agreed that manganese in mild steel welding fumes can cause neurological injury, punitive damages would still be inappropriate because plaintiffs failed to prove that defendants knew it was 'highly probable' that harm would follow from use of their products."[75]  Third, defendants argue a jury "could not reasonably award plaintiff punitive damages [because] defendants warned throughout Cooley's career that welding fumes are potentially hazardous."[76]

Cooley responds correctly that the Court already addressed and rejected these three arguments in *Jowers*.  More specifically, Cooley responds: (1) in fact, there is no legitimate

---

[73]  *Hillrichs*, 514 N.W.2d at 100.

[74]  Defendants' punitive damages motion, docket 258 at 11.

[75]  *Id*. at 13.

[76]  *Id*. at 16.

-18-

scientific debate with respect to whether welding fumes cause neurological injury; (2) harm to at least some individuals was highly probable, given that millions of welding rods were sold to hundreds of thousands of welders, and the severity of that harm is extreme; and (3) the fact that defendants' gave *some* generalized warning does not "immunize" them from a punitive damages award, because their warning was deliberately inadequate regarding a specific, known hazard.

Because the Iowa standard for punitive damages is not identical to the Mississippi standard, the Court will not simply adopt by reference its analysis as articulated in *Jowers*.  Cooley is correct, however, that the vast majority of the relevant facts is the same in both cases and that the practical differences between the two states' laws are not substantial.  On the first point, both Cooley and Jowers presented essentially the same documentary evidence, in the form of trial exhibits, relating to defendants' and the welding consumables industry's knowledge of the dangers associated with manganese in welding fumes – that is, a catalogue of research reports, industry publications, internal memoranda, and similar business records.[77]  These documents were introduced through the witnesses who testified at Cooley's trial, just as they were submitted through witnesses who testified in the *Jowers* case.

Finally, as in *Jowers*, this is a Rule 50(b) motion, and the substantial evidence standard governs the Court's inquiry.  The issue is whether, construing the evidence in Cooley's favor and affording him all reasonable inferences, there is substantial evidence to support the jury's conclusion, even if that evidence is contradicted in the record.  Accordingly, like the Court's Rule 50 opinion on the propriety of punitive damages in *Jowers*, the Court's discussion will proceed in

---

[77] *See Jowers*, 608 F.Supp.2d at 745-56 (discussing numerous trial exhibits).  This Court's opinion in *Jowers* is therefore a useful point of reference for this Memorandum & Order, bearing in mind, of course, that the only evidence relevant to the determination of the motions now before the Court is the evidence presented to the jury in *this* case.

two stages: (1) review of the facts relating to defendants' three arguments; (2) analysis of defendants' arguments under Iowa law.

### a.  Review of the Evidence

### i.  Debate in the Scientific Community

Defendants' first factual argument is that Cooley's medical expert, Dr. Nausieda, testified there is a debate in the scientific community regarding whether manganese in mild steel welding fumes causes neurological injury.[78]  Defendants point specifically to testimony from Dr. Nausieda:

> Q.    Isn't it a fact, Dr. Nausieda, that even today the medical community continues to argue and debate this issue about whether welding fumes from the kind of welding that Mr. Cooley did causes Parkinsonism?
>
> A.    Again, I mean, I can't speak for the whole neurological community.  There are certainly pro and con articles appearing, but it seems to me more people are making this diagnosis, because I get calls asking me about the issues involved in this case far more frequently now.
>
> Q.    There's still a debate.  That's my question, sir.
>
> A.    We wouldn't be in this courtroom if there wasn't a debate.[79]

Defendants argue this testimony is distinguishable from the medical testimony on this issue in *Jowers*, and they contend the distinction is important in light of the Iowa standard for punitive damages.[80]  They argue the medical testimony in *Jowers* indicated a debate exists as to *how often* exposure to mild steel welding fumes causes neurological injury, while the testimony quoted above

---

[78]  Defendants' punitive damages motion, docket no. 258 at 11-13.

[79]  *See* trial tr. at 1311:15-1312:1 (Sept. 21, 2009).

[80]  Defendants' punitive damages motion, docket no. 258 at 17.

acknowledges a debate over whether welding fumes can cause neurological injury *at all*.[81]  Indeed, the testimony elicited by defendants in *Cooley* responds directly to this Court's discussion of the evidence in *Jowers*.[82]  In reply, Cooley argues:  (1) the record as a whole contains substantial evidence that the connection between welding fumes and manganese poisoning is proven; and (2) defendants are taking Dr. Nausieda's testimony out of context.

The Court has reviewed the evidence presented at trial on this issue, construing the evidence and all reasonable inferences to be drawn therefrom in favor of Cooley.[83]  Not surprisingly, defendants' experts generally testified it has not been scientifically established that manganese in welding fumes can cause neurological damage to welders, while Cooley's experts testified it has certainly been established.  For example, at trial, defendants' expert neurologist, Dr. Watts, testified he did not believe it has been proven that excessive overexposure to manganese in welding fumes can cause neurological damage to welders.[84]  He testified on direct-examination that the literature

---

[81]  *Id*. *See Jowers* trial tr. at 545:2-7 (Feb. 11, 2008) (testimony from plaintiff's expert Dr. Burns that "legitimate scientists and physicians are uncertain about the frequency with which the disease occurs.").

[82]  In *Jowers*, the Court observed: "given the evidence adduced at trial, it does not appear to the Court – and apparently it did not appear to the jury – that there actually is 'strong disagreement in the scientific community' that welding fumes can cause neurological injury. * * *  It is more accurate to say there is strong disagreement in the scientific community regarding *how often* welders actually suffer the hazard of MIP, and to what degree they are injured." *Jowers*, 608 F.Supp.2d at 724 (emphasis in original).  Although defendants in *Cooley* seize upon the testimony of Dr. Nausieda as a basis to undercut this conclusion, the Court finds this attempt unavailing, as discussed below.

[83]  The Court does not recite in this opinion all of the evidence supporting the proposition that exposure to manganese in welding fumes can, at least in some circumstances, cause manganism. The Court examined much of this evidence in great depth in the context of assessing its admissibility under the standards set out in *Daubert*.  *See In re Welding Fume Prods. Liab. Litig.*, 2005 WL 1868046 (N.D. Ohio Aug. 8, 2005).

[84]  *See* trial tr. at 2527:14-2528:4.

-21-

supports a diagnosis of manganese poisoning in manganese miners, manganese smelters, manganese ore crushers, and other individuals exposed to manganese, *but not in welders*.[85]  In contrast, Cooley's expert, Dr. Nausieda, testified at trial that manganese poisoning *in welders* has been reported in the medical literature, including in case reports regarding specific individuals.[86]  As explained above, Dr. Nausieda testified the scientific literature is "pretty clear" that manganese in welding fume can cause neurological damage in welders.  Finally, like the plaintiff in *Jowers*, Cooley presented as trial exhibits defendants' own internal memoranda acknowledging, e.g., that "[t]he irreversible neurological damage produced by chronic overexposure to manganese fume is tragic."[87]

Defendants did elicit, during cross-examination of Dr. Nausieda, the statement quoted above that "there is still a debate."  Dr. Nausieda also said that "the neurological community did not recognize mild steel welding fumes as a cause of Parkinsonism" in the 1970s, 1980s, or 1990s.[88]  But defense expert Dr. Watts testified that "manganese in welding fume gets into welders' lungs, then gets into their blood, then [crosses] the blood-brain barrier, and gets into their brain."[89]  Dr.

---

[85]  *See* trial tr. at 2530:2-25.

[86]  *See* trial tr. at 1250:19-25.

[87]  ESAB memorandum from George Barnes to William Esch (Feb. 24, 1992) (trial exh. 260).  In 1979, a widely-distributed literature review by the American Welding Society noted that "[p]otential exposure to manganese occurs whenever this metal is used in electrode coatings or in electrode wire," and that manganese is "poisonous to the nervous system." American Welding Society, "*Effects of Welding on Health,*" at xix (1979) (defendants' trial exh. 190).  This literature review went on to state that the "observation that manganism resembles Parkinson's disease deserves emphasis.  Although no data on the prevalence of parkinsonism in welders are available, there is a concern that some cases of manganese poisoning could be mistakenly diagnosed as Parkinson's disease.  Further investigations may be warranted." *Id.* at 29.

[88]  *See* trial tr. at 1309:2-10.

[89]  *See* trial tr. at 2528:23-2529:3.

-22-

Watts further testified that:  (1) no one knows at what level of exposure to manganese in welding fumes *overexposure* occurs; (2) no one has ever done a large-scale epidemiological study of welders to determine what level of exposure might be safe; (3) there is no difference between manganese that enters the body as a result of mining, smelting, or other sources, and manganese in welding fumes; and (4) neurological damage from overexposure to manganese can be cumulative, occurring over an entire career.[90]   In addition, defendants' expert, Dr. Lang, has stated it is "proven" that it is possible to get manganese poisoning from welding fumes.[91]  At his deposition, Dr. Lang testified:

> Q.    You believe that welders can get manganese-induced Parkinsonism from welding fumes?
>
> A.    Yes.
>
> Q.    That has been proven to your satisfaction in the literature?
>
> A.    Yes.  I think there are enough patients with features that are sufficiently convincing that I believe that, yes.[92]

And Dr. Nausieda testified he agreed with Dr. Lang's opinion on this issue,[93] and he believes the medical literature is "pretty clear" welders can get manganese poisoning from welding fumes.[94]  Furthermore, Hobart Vice President Dr. Sundaram Nagarajan testified at his deposition that

---

[90]  *See* trial tr. at 2528:23-2534:7.

[91]  *See also* trial tr. at 678 (testimony of Carl Peters of Lincoln: "Q.  Do you understand that according to Anthony Lang, this product [i.e., mild steel welding rods containing manganese] can cause neurological injury, correct?  A.  According to his testimony, yes.").

[92]  *See* trial tr. at 1252:24-1253:6; *see also* 934:18-25.

[93]  *Id*. at 1253:8-9 ("Q.  Do you share that opinion with Dr. Lang?  A.  Yes.").

[94]  *Id*. at 1254:2-6.

"[m]anganese in welding fumes under excessive overexposure causes [neurological] damage."[95]  In sum, there exists substantial, albeit not unrebutted, evidence upon which a jury could conclude there is *not* a reasonable debate in the scientific community regarding *whether* manganese in mild steel welding fumes can cause neurological injury; the real debate is how often.

Furthermore, in the *Jowers* opinion on punitive damages, this Court summarized the evidence relating to scientific studies of welding fume toxicity, and many of the same exhibits were introduced in this case.[96]  First, the Court noted the welding consumables industry did not even consider a medico-scientific study of the health effects of welding fumes on welders until approximately 1979, when the American Welding Society ("AWS") Safety & Health Committee considered (but opted not to pursue) a study that would address, among many other things, a "possible connection with manganese exposure in [an] epidemiological study."[97]  More recently, both the plaintiffs and defendants in this MDL litigation have funded medical and epidemiological studies addressing all aspects of the question of whether welding fume causes movement disorders.[98]  The Court ultimately concluded the sum of this evidence is sufficiently reliable to support the conclusion that "exposure to low-manganese welding fumes *can* cause, contribute to, or accelerate

---

[95] *See* trial tr. at 933:14-24 (testimony of Cunitz); trial tr. at 223:21-224:8 (video deposition of "Dr. Naga").

[96] *See Jowers*, 608 F.Supp.2d at 752-55  (discussing trial exhibits, many of which were also introduced in this case).

[97] *See Jowers*, 608 F.Supp.2d at 753 (citing the AWS Safety & Health Committee meeting minutes at 4 (March 19, 1979) (plaintiff's trial exh. 10, also introduced in this trial)).

[98] *See* trial tr. at 433:9-436:22 (Dr. Nitin Kumar Sharma testifying).  *See Jowers*, 608 F.Supp.2d at 753.  As the Court explained in the *Jowers* opinion, as of approximately 2008, defendants had funded approximately $13 million worth of articles and studies, while the plaintiffs funded similar studies to the tune of approximately $ 500,000.  *Id*. at 754 (citing *In re Welding Fume Prod. Liab. Litig.*, 534 F. Supp. 2d 761, 762 (N.D. Ohio 2008)).

-24-

a movement disorder, including parkinsonian syndrome that some doctors will diagnose as [Parkinson's Disease]."[99] While defendants did submit studies that found no proof that welding fume causes neurological injury, the jury was entitled to discount these litigation-related studies as biased.[100]

### ii.     Defendants' Knowledge of, and Warnings about, Welding Fume Toxicity

Defendants' second factual argument is that they did not know of a "high probability" that exposure to welding fumes would cause neurological injury.  Defendants argue their warnings have always been adequate based on the extent of their knowledge and understanding of the risk.

Applying the substantial evidence standard, the Court has reviewed the evidence adduced at trial relating to defendants' knowledge and understanding of welding fume toxicity, as well as the development of the warnings that were available to Cooley on defendants' products.  This evidence is virtually identical to the evidence adduced in *Jowers* on these issues.  Accordingly, what follows is an evidence review that is similar to, but shorter than, the same summary in the *Jowers* opinion.[101]

---

[99]  The Court reached this conclusion  in a lengthy and comprehensive opinion after several weeks of *Daubert* hearings.  *In re Welding Fume Prods. Liab. Litig.*, 2005 WL 1868046 at *36; *see also Jowers*, 608 F.Supp.2d at 753-54.

[100]  As was made clear during trial by Cooley's counsel, the bulk of these studies were funded by defendants or conducted by individuals with monetary connections to one or more of the defendants.  *See Jowers*, 608 F.Supp.2d at 764 n.187 (stating that the jury "was certainly entitled to give these articles and studies less than conclusive weight," and citing *Exxon Shipping Co. v. Baker*, 128 S.Ct. 2605, 2626 n.17 (2008)).

[101]  *Jowers*, 608 F.Supp.2d at 745-56.  The reader should refer to the *Jowers* opinion for further detail on this aspect of the MDL, bearing in mind that *all* of the evidence referenced in *this* Memorandum & Order was presented to the jury in Cooley's trial.  To the extent the Court has already provided a detailed summary of common aspects of the evidence presented in each of the bellwether trials in this MDL, however, it is unnecessary to provide such detail in every case, and the *Jowers* analysis does generally apply.

### *Defendants Historical Knowledge Welding Fumes Are Toxic*

Defendants admit they and the entire welding consumables industry knew by 1940 that welding fumes were toxic.[102]  For example, in the late-1930s, the Metropolitan Life Insurance Company published a book summarizing a German doctor's reports regarding the effects of exposure to manganese in welding fumes.[103]  The MetLife Booklet stated:

> *Manganese* is an important poison from the point of view of its effects rather than from frequency of exposure to it.  Manganese has a selective action on some of the nerve centers of the brain.  It causes a disease similar to paralysis agitans [n/k/a, Parkinson's Disease], which in chronic cases is seldom fatal, but which, owing to the fact that no satisfactory treatment is known, is always disabling.  Prevention, therefore, is the measure to be stressed when the possibility of manganese dioxide fumes or dust is present.
>
> Two cases of poisoning in a mild form, by manganese oxide fumes given off from the electrodes in arc welding of tanks and boilers, have been reported from Germany.  The electrode used contained 0.2 percent manganese.  It is stated that protective filter respirators or air helmets are necessary in tank and boiler work, although in open rooms it is improbable that these precautions will be needed.[104]

Documents of welding industry trade groups such as the American Welding Society ("AWS") and National Electrical Manufacturers Association ("NEMA"), as well as defendants' internal memoranda, show that the MetLife Booklet and its conclusions regarding the toxicity of manganese

---

[102]  *See*, *e.g.*, trial tr. at 932-935; National Electric Manufacturers Association ("NEMA"), Electric Welding Section meeting minutes at 135, discussing MetLife Booklet (Jan. 20, 1938) (plaintiff's trial exh. 140); BOC internal memorandum, quoting MetLife Booklet (plaintiff's trial exh. 197); *see also* trial tr. at 627:18-634:20 (discussing the Booklet and NEMA meeting with Lincoln's corporate representative).

[103]  Metropolitan Life Insurance Company, "*Health Protection of Welders* " Booklet at 23-24 (1938) (plaintiff's trial exh. 937 (discussing Dr. Erich Beintker's report titled "*The Effect of Manganese During Arc Welding*" published in German in 1932)).

[104]  MetLife Booklet, plaintiff's trial exh. 937 at 23-24.

-26-

in welding fumes were widely discussed when they appeared.[105]   Subsequently, defendants

continued to discuss the toxicity of manganese in welding fumes, and the hazards it presented to

welders, both individually and at industry-wide meetings and in correspondence.[106]

### Defendants' Warning & Anti-Warning Practices

There are documents showing that, despite having obtained knowledge that welding fume

could be toxic to the human brain, defendants initially decided, both individually and jointly, *not* to

supply *any* warning with their welding rods, in order to protect sales.[107]   Later, defendants discussed

---

[105]  *See*, *e.g.*, National Electric Manufacturers Association, Electric Welding Section meeting minutes at 135, discussing MetLife Booklet (Jan. 20, 1938) (plaintiff's trial exh. 140); BOC internal memorandum quoting MetLife Booklet (plaintiff's trial exh. 197).

[106]  *See*, *e.g.*, BOC memorandum from I. Yates to F. Saacke at 1 (Oct. 25, 1949) (plaintiff's trial exh. 220) (explaining that "the arc welding industry at one time desired to take every precaution to guard against injury" and decided to put a warning on boxes of welding rods, but later removed it); trial tr. at 667:7-669:6 (discussing the Oct. 25, 1949 memorandum, plaintiff's exh. 220); trial tr. at 2344:1-2346:1 (same); BOC memorandum from Baumer to Kugler (Aug. 18, 1950) (plaintiff's trial exh. 601) (discussing manganism, its effects, and exposure levels); BOC memorandum from F. Saake to members of the Safe Practices Committee (Dec. 7, 1950) (plaintiff's trial exh. 407) (recommending a manganese-specific warning for welding consumables because of the "degree of the hazard").  *See also* AWS, *Effects of Welding on Health* at xix (1979) (defendants' trial exh. 190) (noting that "[p]otential exposure to manganese occurs whenever this metal is used in electrode coatings or in electrode wire," manganese is "poisonous to the nervous system," and the "observation that manganism resembles Parkinson's disease deserves emphasis").

The literature review *Effects of Welding on Health* was prepared for the AWS Safety & Health Committee and overseen by the AWS Research Committee and Research Finance Committee.  Employees of defendants were members of these committees.  Trial tr. at 2212:25-2213:6; 2217:25-2223:16 (discussing with AWS representative Mr. Lyttle the 1979 literature review, its recommendation to conduct an epidemiological study of the affects of manganese in welding fumes, and the fact that AWS has never conducted such a study).

[107]  *See e.g.*, BOC memorandum from I. Yates to F. Saacke at 1 (Oct. 25, 1949) (plaintiff's trial exh. 220) (discussing in an internal memorandum that the arc welding industry had aspired to put a warning on all electrode box labels, but, because some manufacturers did not include a warning, the ones that did were afraid they would be at a competitive disadvantage and removed it); *see also* trial tr. at 667:7-669:6 (discussing the Oct. 25, 1949 memorandum, plaintiff's trial exh. 220); BOC memorandum from F. Saacke to members of Safe Practices Committee (Dec. 7, 1950) (plaintiff's trial exh. 407) (recommending a manganese-specific warning be added to welding

-27-

at AWS and other meetings the cost/benefit of giving a warning, and subsequently adopted an industry-wide approach to warnings that did not include disclosing the risks of permanent neurological injury.[108]   A brief history of defendants' warnings follows.

A 1949 BOC memorandum described the early history of warnings as follows: "the arc welding industry at one time desired to take every precaution to guard against injury, and [NEMA] decided to incorporate a warning clause on all electrode box labels.  It turned out, however, that some of the manufacturers did not do this and as a result immediately capitalized on the advantage of being able to sell an electrode which did not have to be marked 'poison.'  As a result, one by one all of the various manufacturers took this information off the label and all were very glad to get it off."[109]

consumables and stating: "This recommendation is made despite the possible loss of electrode sales, since it is believed that the recent development of data indicating the degree of hazard involved in arc-welding high manganese steels might subject the Company to possible claims for damages that could far exceed any loss of sales that a frank Warning Label might create."); trial tr. at 1620:8-1622:2 (discussing Airco's Electrode Pocket Guide, plaintiff's trial exh. 6169); trial tr. at 635:14-642:11 (discussing Lincoln's documentation reassuring the public and welders that welding fumes do not pose a significant health risk); trial tr. at 2188-2192 (discussing 1979 AWS meeting addressing the need for a stronger warning label, at which Lincoln expressed the belief it would be commercially damaging for one company to adopt a stronger label independently); trial tr. at 2197:1-2198:4 (confirming that neither the industry nor Lincoln adopted the stronger warning label after the 1979 AWS meeting).

[108]   For example, in an internal memorandum, BOC discloses that "[t]he [AWS] safe practices committee, at their meeting on Thursday, December 7, 1950, decided that the use of a manganese fume caution in the subject electrode instruction sheet should be avoided for the time being since other industrial manufacturers and vendors of similar high manganese and nickel manganese steel electrodes do not use fume cautions." BOC memorandum from J. Crowe to E. Cosden (Dec. 11, 1950) (plaintiff's trial exh. 407); see also Hobart memorandum from Sampson to Wiehe summarizing AWS/NEMA joint committee meeting on warning label (May 23, 1979) (plaintiff's trial exh. 547); Minutes of AWS-ASTM Committee on Filler Metals discussing industry-wide adoption of a warning label (June 8, 1966) (plaintiff's trial exh. 362).

[109]   BOC memorandum from I. Yates to F. Saacke at 1 (Oct. 25, 1949) (plaintiff's trial exh. 220); trial tr. 2344:1-2346:1 (discussing plaintiff's trial exh. 220 with defendants' warnings expert,

In 1966, shortly after the tobacco industry first issued warnings about cigarettes, the AWS

Committee on Filler Metal, which had members employed by each defendant in this case, addressed

the question of whether they should put a warning label on welding rods.[110]  Eventually the AWS

agreed that all welding rod manufacturers would adopt a mandatory warning label in 1967.  The

warning label, however, did not make any mention of the hazard of permanent brain damage.  It

read:

> Caution. Welding may produce fumes and gases hazardous to health. Avoid
> breathing these fumes and gases. Use adequate ventilation. *See* USAS Z49.1, 'Safety
> in Welding & Cutting' published by the American Welding Society.

In 1979, largely in response to two lawsuits, the AWS adopted a new, mandatory,

industry-wide warning label, which stated, in pertinent part:

> ***FUMES AND GASES*** can be dangerous to your health.
> •     Keep your head out of fumes.
> •     Use enough ventilation or exhaust at the arc or both.
> •     Keep fumes and gases from your breathing zone and general area.
> * * *
> See American National Standard Z49. 1, "Safety in Welding and Cutting,"
> published by the American Welding Society.

As before, this warning contained no language specifically addressing: (1) the danger of *permanent*

*neurological harm* from manganese in welding fumes; or (2) under what circumstances "ventilation"

or "exhaust at the arc" was or was not "enough" to protect against harm.

In sum, none of the various versions of the cited Z49.1 publication ever mentioned the risk

---

Dr. Christine Wood).  The BOC memorandum also disclosed communications among welding
consumable manufacturers regarding a hazardous fume warning: "from correspondence I have had
with over half a dozen other manufacturers I am sure none of them would consider such a clause on
their labels under any circumstances whatever. . . . Mr. Lincoln of the Lincoln Electric Company
said that if his company did anything like that it wold put him out of business."  *Id.*

[110]  *See* AWS Committee on Filler Metals meeting minutes (June 8, 1966) (plaintiff's trial
exh. 362).

of neurological injury from manganese in welding fumes.[111]  At the same time, defendants continued to acknowledge internally that welding fumes could cause permanent neurological injury, and that they were not including any specific warning to this effect with their products.[112]  For example, as recently as 2002, defendant ESAB's internal documents indicate that its warnings did not adequately inform welders of "the irreversible nature of the symptoms."[113]

Cooley, moreover, presented evidence from which a jury could reasonably conclude (and apparently did conclude) that the industry decided to explicitly downplay the health hazards associated with welding fumes.[114]  As discussed further below, Cooley's expert referred to this type of misleading communication, meant to mitigate the force and effect of a warning, as an

---

[111]  *See, e.g.,* defendants', trial exh. 2847 (ANSI Z49.1-**1983**), plaintiff's trial exh. 6057 (ANSI Z49.1-**1994**); *see* trial tr. at 2158:19-2168:1 (AWS representative characterizing ANSI Z49.1 as the "bible of welding" and agreeing that it does not "say anything about the risk of neurological injury in welding fume").

[112]  *See generally* testimony on cross-examination of defense witness Kevin Lyttle regarding AWS, trial tr. at 2157:15-2238:6.

[113]  *See* trial tr. at 1688:14-1689:22 (discussing memorandum from Mario Amata, plaintiff's trial exh. 274); trial tr. at 2215:2-2216:10.

[114]  *See* trial tr. at 627:18-634:20 (discussing the Booklet with Lincoln's corporate representative); trial tr. 637-638 (cross-examination of Lincoln representative Mr. Peters discussing distribution of plaintiff's trial exh. 230, an article entitled "Welding 'Hazards': Our Modern Day Mythology," by T.B. Jefferson, which ridiculed those who associated welding with any health risk, while stating that "toxic gases are not produced by electrode coatings," and that "[l]ead poisoning is the only chronic ailment that can be caused by welding fumes; *other illnesses attributable to fumes dissipate quickly and have no cumulative effect*.").  During direct examination, Dr. Cunitz, Cooley's warnings expert, described various examples of publications which defendants distributed, and which Dr. Cunitz characterized as knowingly misrepresenting and minimizing the harmful effects of welding fumes.  Trial tr. at 942:5-949:1 (discussing "Welding Hazards: Our Modern Day Mythology" (plaintiff's trial exh. 230), Lincoln's Handbook (plaintiff's trial exh. 487), a reprinted article by Clyde Clason entitled "Welding and Cutting Fumes" (plaintiff's trial exh. 218)); *see also* trial tr. 637:2-642:15 (cross-examining Lincoln representative Carl Peters regarding Lincoln's dissemination of the Jefferson article (plaintiff's trial exh. 230) and Clason article (plaintiff's trial exh. 218)).

-30-

"anti-warning."[115]  For example, in 1955, despite knowledge of the information contained in the MetLife Booklet, defendant Lincoln issued a publication directed at welders, stating that "[m]uch research has been done which has proven that the fumes and smoke obtained when welding steel and the ferrous alloys *are not harmful.*"[116]  Similarly, the AWS published an article to introduce the 1967 warning label in hopes of reassuring consumers that welding was safe.[117]  The article stated, among other things: "Over the years, the number of welders who have shown any effects from these fumes has been extremely small, and their disability temporary, usually less than 24 [hours];" and "[t]he appearance of the precautionary label should not be interpreted as an indication of any change in the potential health hazard from welding fumes."[118]  This article was reprinted and distributed to thousands of customers, according to an AWS-coordinated plan.[119]  This and other industry publications indicated the hazard of exposure to welding fumes was not permanent brain damage,

---

[115]  *See* trial tr. at 935:15-936:1 (human factors psychologist Dr. Cunitz defining "anti-warning").

[116]  *See* Lincoln, "*Procedure Handbook of Arc Welding,*" at 1-27 (11th ed. 1957) (plaintiff's trial exh. 487) (emphasis added).

[117]  *See* trial tr. at 945:1-21 (discussing defendants' publication of the article "Welding Industry to Use Caution Label on Filler Metal Packages"); Airco cover memorandum to distributors introducing the article "Welding Industry to Use Caution Label on Filler Metal Packages" (July 16, 1968) (plaintiff's trial exh. 1701); *see also* trial tr. at 948:2-949:1.

[118]  Airco Pocket Guide (reprinting the article "Welding Industry to Use Caution Label on Filler Metal Packages") (plaintiff's trial exh. 6169).

[119]  Trial tr. at 535:18-541:3 (discussing during cross-examination of BOC representative Daniel Chute the distribution of articles regarding the safety of welding); trial tr. 635:14-6642:11 (discussing during cross-examination of Lincoln representative Carl Peters the distribution of articles regarding the safety of welding); plaintiff's trial exh. 1701 (discussing preparation and distribution of the AWS article); *see also* plaintiff's trial exh. 6169 (Pocket Guide, including reprint of the article, "Welding Industry to Use Caution Label on Filler Metal Packages.").

but a 24-hour flu-ish feeling known as "metal fume fever."[120]  In addition, shortly after the 1967 industry-wide warning was adopted, Lincoln made a policy decision to place the new warning on cartons of welding rods, but not on the product inside the carton, knowing this reduced the chance that a welder would actually see the new warning (because large employers routinely remove rods from the cartons before giving the rods to welder-employees).[121]  A jury could reasonably construe all of these actions as purposeful efforts by defendants to minimize the impact of their own warnings.

Naturally, defendants contended at trial (and contend now) that there are innocent explanations for the statements in these documents.  The Court's role, however, is not to weigh the competing evidence.  These materials constitute evidence that, while defendants (and the welding rod industry generally) were acknowledging privately that welding fumes could cause permanent neurological injury, defendants were not being candid about this hazard with the general public, for fear of how candor might affect sales, and the jury had the right to rely upon that evidence.

### Government and Other Industry Standards

In addition to the AWS mandatory warning, there are other relevant industry and government standards. The American Conference of Governmental Industrial Hygienists ("ACGIH") has established measures to define safe exposure to various toxins, including manganese.[122]  "Threshold Limit Values" ("TLVs") are one such measure.[123]   The TLV for manganese promulgated by the

---

[120]  *See* trial tr. at 945:14-947:21.

[121]  Trial tr. at 675:2-18.

[122]  *See generally* testimony of David Kahane, industrial hygienist, trial tr. at 1500-1502.

[123]  The TLV is a maximum average amount to which, it is believed, a person may be safely exposed over an 8-hour period.  *See In re Welding Fume Prods. Liab. Litig.*, 526 F. Supp. 2d 775,

ACGIH has dropped over time.  When first published in 1948, the TLV was an 8-hour time-weighted average of 6.0 mg/m$^3$; it was dropped in 1960 to 5.0 mg/m$^3$; dropped again in 1979 to 1.0 mg/m$^3$; and then dropped again in 1995 to 0.2 mg/m$^3$.[124]  Since 1995, ACGIH has twice proposed even further reductions; in 2009, the proposed TLV for manganese was 0.02 mg/m$^3$.[125]  In fact, industrial hygienist David Kahane testified that "at least some of the support for the proposed change [to the TLV for manganese] is based on welders and welding fume exposure."[126]  These actual and proposed reductions in the manganese TLV reflect a consensus among industrial hygienists that the more that is known regarding the toxicity of manganese, the lower the exposure limits must be set to ensure "no adverse health effects," and particularly to protect against brain damage.

Of course, the lower the TLV of a given substance, the more difficult (and expensive) it becomes to ensure that workers' exposures do not exceed it.  Thus, the welding rod industry opposed the change from 1.0 to 0.2 mg/m$^3$ TLV.[127]  In 1994, members of the American Welding Society met to discuss the then-proposed reduction of the manganese exposure TLV from 1.0 to 0.2 mg/m$^3$. The AWS meeting minutes state that defendant Lincoln "estimated that if the TLV is lowered to 0.2 milligrams per cubic meter, then the overall welding fume limit . . . would be exceeded in most

---

784 n.33, 789-90 n.65 (N.D. Ohio 2007).

[124] *See* trial tr. at 1502:19-1503:24 (testimony of David Kahane, industrial hygienist).

[125] *See id*. at 1503:25-1506:6.

[126] *See id*. at 1507:2-6.

[127] *See* trial tr. at 1512:24-1515:4 (discussing plaintiff's trial exh. 215, a letter from ACGIH to Ken Brown at Lincoln).

workplace atmospheres."[128]  Despite the fact that the ACGIH did, in fact, reduce the manganese

TLV to 0.2 mg/m$^3$ in 1995, none of defendants changed their warning language.  After the reduction

of the TLV, the AWS Committee on Fumes and Gases explicitly recognized, once again, that the

new limit will "be exceeded in most workplace atmospheres" – that is, most welders would be

overexposed.[129]

Congress regulates the welding industry via the Occupational Safety and Health Act of 1970

("OSHA").[130]  Under OSHA, the United States Secretary of Labor sets "mandatory occupational

safety and health standards applicable to businesses affecting interstate commerce."[131]  In 1974, the

Secretary promulgated regulations requiring "suppliers of welding materials [to] determine the

hazard, if any, associated with the use of their materials in welding, cutting, etc." and provide the

following "minimum" warning on "[a]ll filler metals and fusible granular materials":

CAUTION

Welding may produce fumes and gases hazardous to health.  Avoid breathing these
fumes and gases.  Use adequate ventilation.  See ANSI Z49.1-1967 Safety in
Welding and Cutting Published by the American Welding Society.[132]

This language rings familiar – it is the same warning the entire welding consumables industry had

---

[128]  AWS Fumes and Gases Committee meeting minutes at 3 (Oct. 4, 1994) (plaintiff's trial
exh. 920); trial tr. at 1532:17-1535:2 (discussing the Oct. 4, 1994 meeting minutes).

[129]  AWS Project Committee on Fumes and Gases Meeting Minutes at 2 (Oct. 18, 1995)
(plaintiff's trial exh. 1023); trial tr. at 1532:17-1535:2.

[130]  29 U.S.C. § 651 *et seq.*

[131]  29 U.S.C. § 651(b).

[132]  *See* 39 Fed. Reg. 23502, 23738-50 (June 27, 1974) (promulgating 29 C.F.R. §
1910.252(f)(1)(v)(a)).  The 1967 version of ANSI Standard Z49.1 is 67 pages long, not including
table of contents and appendices.  "ANSI" stands for "American National Standards Institute," and
"Z49.1-1967" refers to the 1967 version of their "Standard Z49.1," entitled "Safety in Welding,
Cutting, and Allied Processes."

-34-

adopted as their own mandatory warning in 1967.  Although the industry has changed its warnings since 1974, OSHA has never updated this regulation.[133]  OSHA's position is that this standard remains appropriate, even though the defendants use new language.[134]

In 1985, the Secretary of Labor promulgated the Hazard Communication Standard ("HazCom Standard"), which, among other things, directed product manufacturers to "ensure that each container of hazardous chemicals leaving the workplace is labeled, tagged or marked with . . . [the] [i]dentity of the hazardous chemical(s); [and] [a]ppropriate hazard warnings."[135]  The Secretary further defined an "appropriate hazard warning" as one that "convey[ed] the specific physical and health hazard(s), including target organ effects, of the chemical(s) in the container(s)."[136]  In the wake of the new federal HazCom Standard, however, no defendant added known "target organ" information to its warning labels, such as mentioning the possibility of brain damage.[137]

In sum, the jury was presented with evidence that: (1) the defendants knew of, and even helped create, industry and government standards and regulations; and (2) the defendants did not adhere to these standards or regulations.

---

[133]  *See* trial tr. at 1507:7-22 (testimony of David Kahane, industrial hygienist); *see also* trial tr. at 975:11-20, 978:3-7 (testimony of Robert Cunitz, human factor psychologist, explaining that OSHA adopted the ANSI Standard Z49.1-1967 because it was readily available and that it remains the minimum standard).

[134]  *See* trial tr. at 986:8-24.

[135]  29 C.F.R. § 1910.1200(f)(1).

[136]  *Id.* § 1910.1200(c).

[137]  Trial tr. at 1682:25-1684:7 (testimony of ESAB representative, Mr. Ferree); trial tr. 1035:4-1036:22 (Dr. Cunitz testifying regarding Lincoln internal memorandum discussing the HazCom target organ requirement) (plaintiff's trial exh. 567).

-35-

### iii.    Defendants' Warnings to Cooley

Defendants' third and final factual argument is that they *did* warn Cooley that breathing welding fumes is dangerous throughout his career and, therefore, they are immune from liability for punitive damages under the Iowa standard and the circumstances of this case.

Some of the historical development of the warnings is described in the above section.  Put simply, from the time Cooley began welding in 1967 until 1991, defendants used a version of the following warning:

> Caution. Welding may produce fumes and gases hazardous to health. Avoid breathing these fumes and gases. Use adequate ventilation.[138]

For the remainder of Cooley's career – 1991-2003 – defendants began to reference manganese in the safety information associated with their products, although *not* on the warning label itself.  In 1991, for example, Hobart included in its Material Safety Data Sheet ("MSDS")[139] the statement "nervous system damage may result from overexposure" to manganese in its product.[140]  In 1996, Lincoln used the same approach, including language in its MSDS stating:  "Manganese present in the fumes from this product may affect the central nervous system, resulting in poor coordination, difficulty speaking, and tremor of arms and legs. The condition is considered irreversible."[141]  Hobart has included some sort of language about manganese and neurological damage in its MSDSs since

---

[138]  *See* trial exh. 2847 (AWS 1983 mandatory warning label – ANSI Z49.1-**1983**).  As discussed above, the AWS revised the mandatory warning label in 1979, but did not materially change the substantive information contained in the warning.

[139]  "MSDS" stands for Material Safety Data Sheet.  MSDSs contain information about the properties and potential hazards of a particular product or material.  OSHA requires employers to have an MSDS available to employees who work with welding consumables.

[140]  *See* trial tr. at 958:22-959:16.

[141]  *See* trial tr. at 670:20-24, 677:9-678:3.

1987, and ESAB and Lincoln since 1993.[142]  ESAB is the only defendant to incorporate manganese-specific language on their actual warning label, which first occurred in 2002.[143]  As discussed below, Cooley presented evidence indicating defendants did not make an effort to inform consumers effectively that their existing product warnings had been amplified.[144]

Cooley also presented evidence explaining characteristics of an effective warning, including the principle that a warning is inadequate unless it identifies clearly:  (1) the hazards; (2) how to avoid the hazards; and (3) the consequences of failure to avoid.[145]  Cooley's warnings expert, Dr. Cunitz, testified that defendants' warnings did not meet these criteria.[146]  Indeed, there was substantial evidence from which a jury could reasonably conclude that defendants knew and understood these three elements of an effective warning, and purposefully chose not to employ them. At trial, Dr. Cunitz testified that defendants' internal memoranda contained statements reflecting a

---

[142]  *See* trial tr. at 885:21-886:2 (Hobart); 2312:14-2313:9 (ESAB); 2313:16-24 (Lincoln).

[143]  *See* trial tr. at 958:10-18.

[144]  *See*, *e.g.*, trial tr. at 2347:12-2348:14 (discussing the ineffectiveness of communicating information to welders through MSDSs, based on an OSHA study entitled *Hazard Communication: A Review of the Science Underpinning the Art of Communication for Health and Safety* at § 3.3.1 (May 23, 1997) (plaintiff's trial exh. 6056) (noting that MSDSs are a poor method of informing welders of hazards)).  Indeed, Hobart and Lincoln's approach – including references to manganese in MSDSs, but not on the warning label itself – is some evidence they did not want welders to learn any new safety information about the product.  *See* trial tr. at 670:20-675:20 (discussing Lincoln's 1996 addition to its product information); *see also* trial tr. at 2953:4-2954:10 (co-worker of Cooley testifying that in 2003 and at the time of trial he did not know manganese in welding fume can cause brain damage).

[145]  *See* trial tr. at 949-951 (human factors psychologist Dr. Cunitz discussing a leading textbook on warnings and describing the "three major elements" of an effective warning). *See also Jowers*, 608 F.Supp.2d at 760 (citing Michael S. Wogalter, *Handbook of Warnings* 56 (2006) (trial exh. 5433c); plaintiff's trial exh. 128 (AWS A5 Task Group on Warning Label Meeting Minutes at 3 (Mar. 7, 1979).

[146]  *See* trial tr. at 956:1-23.

clear understanding of the three basic rules of warnings.[147]  Moreover, industry documents discussing the content of the defendants' warnings acknowledged their deficiency.  For example, in 1979, the American Welding Society's Task Group on Warning Labels noted that a warning must identify clearly the products' hazards, "how to avoid" the hazards, and the "consequences" of a failure to avoid.[148]  Even as late as 2002, defendant ESAB acknowledged that its MSDS "fails to highlight the 'irreversible' nature of the symptoms; therefore, it is not a complete statement of the potential damage."[149]

Dr. Cunitz further testified regarding "anti-warnings."[150]  He explained to the jury that an anti-warning:

is kind of the opposite of a warning.  It's a message that says: Well, there's this issue, but don't worry about it.  It's a concept of downplaying and minimizing the danger that's present as opposed to presenting it in a realistic and actual manner.  It's a difference between worry about this and don't worry about this.[151]

Similarly, a leading textbook on warnings describes the concept of anti-warnings as follows:

The second strategy is to produce media that deliberately misrepresent dangerous products as safe in order to contradict or eviscerate true warnings.  These can include, for example, training materials, advertisements, or promotional materials that project an image of safety for what is in actuality a dangerous product or material.  We call these antiwarnings.[152]

---

[147]  *See* trial tr. at 953:23-954:21.

[148]  AWS A5 Task Group on Warning Labels Meeting Minutes at 3 (Mar. 7, 1979) (plaintiff's trial exh. 128); trial tr. 953:23-954:21.

[149]  Internal ESAB memorandum from Mario Amata to Stan Ferree (Nov. 18, 2002) (trial exh. 274).

[150]  *See* trial tr. at 935:15-936:1 (human factors psychologist Dr. Cunitz defining "anti-warning").

[151]  *See* trial tr. at 935:20-936:1.

[152]  *See* trial tr. at 937:18-938:1 (quoting from a leading warnings textbook).

Dr. Cunitz testified regarding examples of defendants' use of anti-warnings.[153]  For example, in 1979, representatives of each defendant attended a meeting of an AWS-NEMA joint committee dedicated to developing a new warning label, based on the recognition that the 1967 AWS warning was "insufficient."[154]  After that meeting, however, defendants disseminated publications and documents Mr. Cunitz characterized as anti-warnings.[155]  Dr. Cunitz told the jury that these publications and documents "are examples of antiwarnings.  You have on the one hand the knowledge of a connection, being manganese exposure and serious health effects, and on the other hand you've got documents and materials suggesting this is not a problem and everything is perfectly fine, and there's no safety issue.  So you've got two messages that are different."[156]

Thus, a jury could reasonably conclude the evidence adduced at trial demonstrated that: (1) defendants knew that manganese in welding fumes could cause neurological injury; (2) welders were frequently "overexposed" to manganese in welding fume; (3) prior to 2002, none of defendants' warning labels disclosed the hazard that exposure to manganese in welding fumes could cause neurological damage; (4) established principles of warnings known to defendants require the manufacturer of a hazardous product to identify the hazards, how to avoid them, and the

---

[153]  *See* trial tr. at 938:15-949:1 (discussing plaintiffs' trial exh. 547, Sampson Report of AWS-NEMA Joint Committee attended by John Sampson of Hobart, Ted Ashton of Lincoln, George Spies of BOC, and Jim Rosamilia of ESAB; plaintiffs' trial exh. 230, T.B. Jefferson, "Welding Hazards:  Our Modern Day Mythology;" plaintiffs' trial exh. 487, Lincoln Handbook, 11th ed.; plaintiffs' trial exh. 218, Clyde Clason article).

[154]  *See* trial tr. at 938:21-939:22.

[155]  *See* trial tr. at 944:7-949:1 (discussing plaintiffs' trial exh. 547, Sampson Report of AWS-NEMA Joint Committee; plaintiffs' trial exh. 230, T.B. Jefferson, "Welding Hazards:  Our Modern Day Mythology;" plaintiffs' trial exh. 487, Lincoln Handbook, 11th ed.; plaintiffs' trial exh. 218, Clyde Clason article).

[156]  *Id*. at 944:7-15.

-39-

consequences of failure to avoid; (5) defendants knew these principles and knew their warnings did not satisfy them; and (5) defendants used "anti-warnings" to mitigate the force of the warnings they did provide.

### b.    Analysis:  Iowa Punitive Damages Law Applied to the Facts

Upon review of all the evidence in the record in this case, construed in the light most favorable to Cooley and affording him all reasonable inferences, the Court finds substantial evidence upon which a jury could conclude punitive damages are appropriate under applicable Iowa law. It is irrelevant whether the Court, had it been acting as the trier of fact, would have imposed punitive damages.  The Court clearly informed the jury of the Iowa standard for punitive damages in the jury instructions.[157]  Indeed, the Court's instructions focused on the explicit language of the Iowa punitive damages statute, rather than explanatory Iowa case law, which disclosed a somewhat more lenient standard for imposition of punitive damages.  The only issue is whether, affording Cooley "every legitimate inference that can be reasonably drawn from the evidence," reasonable minds could disagree as to whether substantial evidence supported Cooley's punitive damages claim.[158]  Based

---

[157]  Trial tr. at 3309:13-3313:13.  The Court explained the nature of punitive damages and, consistent with Iowa Code § 668A.1(1)(a), instructed the jury, *inter alia*, as follows:

> You are not required to award punitive damages to Mr. Cooley, and you may not do so unless you find that he has proven by a preponderance of clear, convincing, and satisfactory evidence that the defendant's conduct constituted a willful and wanton disregard for the rights or safety of another and caused actual damages to the plaintiff.
> . . .
> "Willful and wanton" is a legal term with a specific meaning.  Conduct is willful and wanton when a person intentionally does an act of unreasonable character in disregard of a known or obvious risk that is so great as to make it highly probable that harm will follow.

*Id*.

[158]  *See Woods*, 480 N.W.2d at 65.

-40-

on this standard, Cooley has shouldered his burden under Iowa law to present clear and convincing evidence that defendants' conduct was in willful and wanton disregard of his safety.  Each factual argument will now be addressed in turn.

### I.        "Reasonable Disagreement" in the Scientific Community

Defendants argue punitive damages are inappropriate in this case because Iowa law precludes a punitive damages award "when room exists for reasonable disagreement over the relative risks and utilities of the conduct and device at issue."[159]  They argue this case is analogous to *Mercer*, the smoke detector design defect case, in which the Iowa Supreme Court reversed an award of punitive damages based, at least in part, upon "a reasonable disagreement over the relative risks and utilities" of the conduct and device at issue.[160]  Therefore, the first question is whether there actually is reasonable disagreement with respect to the threshold question of whether manganese in mild steel welding fumes can cause neurological damage.

Based on the evidence presented, the jury answered that question in the negative.  Construed in the light most favorable to Cooley, the evidence shows paid experts debating whether this question is really debatable.  The jury was entitled to conclude that the opinions of defendants' paid experts in this debate were not reliable, and that other evidence (including defendants' own documents) established that manganese in mild steel welding fumes unquestionably can cause neurological damage.

Ultimately, no evidence was presented in this trial that would undermine the validity of the Court's conclusion on this same argument in *Jowers* – there is substantial evidence in the record to

---

[159]  *Hillrichs*, 514 N.W.2d at 100.

[160]  *Mercer*, 616 N.W.2d at 617.

-41-

support the jury's conclusion that there is no genuine debate as to whether manganese in welding

fumes can cause manganese poisoning.  In *Jowers*, the Court concluded as follows:

> The weakness with [defendants'] argument is that, given the evidence adduced at trial, it does not appear to the Court-and apparently it did not appear to the jury-that there actually *is* "strong disagreement in the scientific community" that welding fumes can cause neurological injury.  As discussed above, defendants' own expert neurologists agree that manganese in welding fumes can accumulate in the brain and cause Manganese-Induced Parkinsonism.  This knowledge is not new: the first scientific report of MIP in welders dates to 1937, and treatises on industrial hygiene in the first half of the 20th century explain that welders can suffer brain damage from excessive manganese exposure.  Further, defendants' own internal documents-as opposed to the publications they wrote for welding journals-have for decades acknowledged the existence of welders who suffered neurological injury due to welding fume exposure.
>
> It is more accurate to say there is strong disagreement in the scientific community regarding *how often* welders actually suffer the hazard of MIP, and to what degree they are injured.  It is generally agreed that, like other toxin-related injuries, whether a welder will ever suffer MIP (and the degree of his impairment) depends on: (1) individual susceptibility, and (2) the "dose," meaning how much manganese he is exposed to (both cumulative and episodic). The parties and their experts disagree vehemently, however, on how these factors combine to disclose the frequency with which welders *actually* suffer MIP, and the extent of their physical injuries.[161]

This analysis remains accurate.  The fact that Dr. Nausieda stated in this case that there is

a "debate" is inconsequential.  In context, Dr. Nausieda's statement refers to the simple fact that, for

the purposes of this litigation, the welding consumables industry has resisted conceding that welding

fumes can cause neurological injury in normal circumstances.[162]  In addition, Dr. Nausieda explained

---

[161]  *Jowers*, 608 F.Supp.2d at 763.

[162]  Defendants responded to a request for admission on this point.  To the request "[a]dmit that it is possible that sustained exposure to manganese in welding fumes can affect the central nervous system and thereby can cause a movement disorder known as manganism," defendants responded:
> * * * Defendant admits that it is possible that sustained overexposure to manganese in welding fume in quantities far in excess of OSHA's PEL and the ACGIH's TLV can cause damage in a defined pattern with preferential damage to the globus

that the neurological community was not aware of a connection between welding fumes and manganese poisoning in the 1970s, 1980s, and 1990s *because treating physicians were not aware that welding fumes contained manganese*, not because the connection between manganese and neurotoxicity was unknown.[163]  Taken as a whole, there is no ambiguity in Dr. Nausieda's testimony – he opined that, during Cooley's welding career, it was settled in the scientific community that exposure to manganese contained in welding fume can cause manganese poisoning.  Dr. Watts's expert testimony for defendants, moreover, revealed there is no disagreement in the scientific community with respect to the following:  (1) overexposure to manganese causes neurological injury; (2) no one knows how much exposure to manganese is too much; (3) when a welder inhales welding fumes, manganese enters the blood stream and crosses the blood-brain barrier; (4) manganese miners, manganese smelters, and other individuals likely to inhale manganese can and do get manganese poisoning; and (5) many doctors did not diagnose movement disorders in welders as manganese poisoning because the connection between manganese and welding was not (and is not) widely known in the medical community.

Dr. Watts opined the medical community is still debating whether manganese in welding fumes can cause manganese poisoning because, to date, no one has proven a connection through a

---

pallidus within the basal ganglia and thereby could cause damage to the central nervous system and thereby could cause a movement disorder known as manganism, a form of parkinsonism that can be distinguished clinically, radiologically, pharmacologically and pathologically from Parkinson's disease and other movement disorders.  * * * Whether this occurs in the context of occupational exposure to welding fumes, and at what exposure level, has not been established by reliable scientific evidence.

*See Clinger v. Lincoln Elec.*, 04-cv-17118 (Lincoln's response to plaintiff's Request for Admission No. 25, at 14).

[163]  *See* trial tr. at 1417:6-1420:13.

-43-

large-scale epidemiological study of welders.  But Cooley presented evidence, including statements of defense experts such as Dr. Lang, that welding fumes can cause manganese poisoning.  The record also contains examples of actual diagnoses of manganese poisoning in welders, indicating that welding fumes can cause manganese poisoning.  In addition, Cooley presented evidence that many of the studies and articles questioning whether manganese in welding fumes can cause manganese poisoning were prepared by doctors and scientists who were paid by defendants and/or the welding consumables industry.

Defendants are correct that Iowa law – particularly *Mercer* – makes this a closer question than it was in *Jowers*.  Under *Mercer*, a reasonable disagreement with respect to the nature and degree of the risk caused by a product and the adequacy of the associated warning is a critical consideration in determining whether a punitive damages award is appropriate.  This standard is slightly higher than the one at issue in *Jowers*, where Mississippi law was less explicit about the effect of such a disagreement.[164]  But application of the standard set out in *Mercer* does not change the result, for three reasons.

First, as discussed above, construing the evidence, and all reasonable inferences, in the light most favorable to Cooley, there was substantial evidence that there is no reasonable debate regarding the risk of manganese in mild steel welding fumes causing neurological injury to welders.  The risk is real and exists; the only question is how frequently welders suffer manganese poisoning and how seriously they are injured.  Therefore, the *Mercer* consideration does not apply as a solid bar to punitive damages, because the jury could conclude Dr. Watts' testimony did not support the conclusion that there was a sufficiently reasonable disagreement to trigger its application.

---

[164] *See Jowers*, 608 F.Supp.2d at 764-65 (citing *Satcher v. Honda Motor Co.*, 52 F.3d 1311, 1317 (5th Cir. 1995), *cert. denied*, 516 U.S. 1045 (1996)).

Second, the *Mercer* rule might apply if there is a reasonable disagreement regarding the adequacy of the warning.  In other words, punitive damages could be less appropriate if there was a reasonable disagreement over the adequacy of the specific language of the defendants' warning. This was arguably the circumstance in *Mercer*, because the manufacturer knew its ionization smoke detector would not always alert to smoldering fires and, thus, warned consumers that the detector "may not sense every kind of fire every time."[165]  The manufacturer adduced evidence at trial indicating it adopted this warning in order to specifically address the known possibility that the device would not detect a smoldering fire, but it did not include more specific information in order to avoid confusing consumers.[166]  Thus, to the extent that *Mercer* is a warnings case,[167] it arguably stands for the proposition that, where there is a reasonable disagreement over the adequacy of the warning, punitive damages are not appropriate.

In this case, however, there was substantial evidence to support the conclusion that defendants *knew* their warning was inadequate because it did not specifically address a serious known hazard (manganese, a known neurotoxin), how to avoid the hazard (by explaining how to obtain "adequate ventilation"), or the consequence of failure to avoid the hazard (irreversible brain damage).  There was substantial evidence that, in spite of this knowledge, defendants chose not to include appropriate and adequate information in the warning, for fear that doing so would reduce sales of their product.  The jury was entitled to rely on this evidence and discount evidence to the

---

[165]  *Mercer*, 616 N.W.2d at 626.

[166]  *Id*. at 625.

[167]  *See supra* regarding ambiguity as to whether the "reasonable disagreement" language in *Mercer* actually relates to the warnings claim and not just the design defect claim.

-45-

contrary.[168]  Consequently, this case is distinguishable from *Mercer*, where the manufacturer included a warning designed to address the specific harm at issue, but there was a reasonable disagreement with respect to whether that warning was adequate.

Third, defendants overstate the importance of the *Mercer* rule.  As discussed above, whether there is reasonable disagreement is a *consideration* in the punitive damages analysis.  It is not dispositive.  Interpreting the *Mercer* rule as a non-dispositive consideration is consistent with *Hillrichs*, in which the Iowa Supreme Court announced the "reasonable disagreement" principle in a design defect case, but also expressly noted there was no evidence to "support an inference that the manufacturer took the position it did for its own economic advantage."[169]  There is evidence in this case that supports such an inference.  In other words, even to the extent that *Mercer* is, in fact, analogous to this case, it is also distinguishable.

Recognizing that "reasonable disagreement" is a non-dispositive consideration is meaningful here because of the unusual, prominent presence of the other critical factor – substantial evidence that defendants had a pecuniary motive for using an inadequate warning that could be misleading. Indeed, this appears to be the kind of case the Iowa Supreme Court was alluding to in *Hillrichs*, when it announced and applied the "reasonable disagreement" rule but qualified it by noting the *absence* of evidence indicating the manufacturer's position was motivated by economic

---

[168]  *See Woods*, 480 N.W.2d at 65.

[169]  *Hillrichs*, 514 N.W.2d at 100.   In *Jowers*, moreover, the Court relied on *Iowa* law – *Hillrichs* and *Burke*, 6 F.3d at 512, specifically – to distinguish welding fumes cases from design defect cases involving a reasonable disagreement regarding a given product design. *Jowers*, 608 F.Supp.2d at 765.

-46-

considerations.[170]  Even assuming *arguendo* that there was, at some time in the history of Cooley's welding career, reasonable disagreement over the adequacy of the warning language, the jury was entitled to consider evidence indicating that defendants based their warnings decisions on a cost/benefit analysis that weighed their customers' safety against their own profitability.  While the evidence on this point was not overwhelming, and was hotly debated, it was certainly not insubstantial.  Unlike in *Hillrichs*, *Mercer*, and *Fell*, the jury in this case could reasonably conclude the evidence showed defendants' pecuniary interest led them to a  "willful and wanton disregard" for Cooley's safety.

For all of the foregoing reasons, defendants' first argument – that they are entitled to judgment as a matter of law on Cooley's claim for punitive damages because of a scientific debate regarding the neurotoxicity of welding fumes – is not well-taken.

### ii.        Probability of Harm

Defendants next argue that, even assuming they knew welding fumes could cause manganese poisoning, the evidence did not show they disregarded a known or obvious risk so great as to make it highly probable that harm would follow.  This is the proper standard, and the jury was so instructed.[171]  The issue, then, is whether there is substantial evidence upon which the jury could conclude defendants disregarded a known risk which was so great that it was highly probable harm would follow.

The first component of this question is whether defendants disregarded a known risk.  For

---

[170]  *Hillrichs*, 514 N.W.2d at 100; *see also Fell*, 457 N.W.2d at 919 (describing the economic interest factor).

[171]  Trial tr. at 3310:16-20 (instructing the jury regarding the definition of "willful and wanton disregard" in the context of punitive damages).

-47-

the reasons discussed above, there was substantial evidence on which a jury could conclude defendants knew manganese in welding fumes could cause permanent neurological damage.  There was also evidence that defendants knew welders would routinely be overexposed to manganese.  In addition, defendants understood that welders generally believed the specific hazard of breathing welding fumes was "metal fume fever," a 24-hour sickness with flu-like symptoms and no permanent effects, and that was the possible consequence they were being warning about.  But defendants did nothing to dispel that notion.  In fact, Cooley adduced evidence indicating that defendants purposely disseminated information reassuring welders there were no negative, long-term neurological health effects associated with welding.  Finally, defendants understood that a proper warning includes both explicit direction on how to avoid the hazard, and information regarding the consequences of failure to heed the warning.  This is substantial evidence that defendants disregarded a "known risk."

The second half of the probability analysis is whether the known risk defendants disregarded was so great as to make it highly probable that harm would follow.  In *Jowers*, the Court explained that the magnitude of a known risk encompasses both: (1) how often a known hazard occurs; and (2) its severity.[172]  In other words, there is a sliding scale between frequency and severity that should inform a company's decision with respect to a warning.[173]  "It is true that, the less frequently a known hazard occurs, the less reckless a defendant reasonably may be deemed for failing to warn about it.  But it is also true that the more serious a known hazard is, the more reckless a defendant

---

[172]  *Jowers*, 608 F.Supp.2d at 764.

[173]  *Id*. at 764 n.186.

-48-

may be deemed for failing to warn about it, even if the hazard occurs only rarely."[174]  In *Iowa,*

*Chicago, & Eastern Railroad Corp.*, the Northern District of Iowa, applying Iowa law, held that

driving a tanker truck full of volatile liquids across railroad tracks without looking for a train creates

a risk of harm so great that it is "highly probable" that harm will result.[175]  Although the truck will

almost certainly sneak across the tracks, people will die in the unlikely event it does not.

Furthermore, like many diseases caused by exposures to toxins – e.g., lung cancer – individual

susceptibility is an important factor.  A welder who is consistently overexposed to manganese may

never develop a movement disorder, while a substantially lesser incidence of overexposure may be

enough to trigger manganese poisoning in another.  And, exposure to manganese is cumulative.  The

"probability" of harm discussed in the case law must account for these factors.

Here, defendants knew their welding rods would be distributed and used by millions of

welders.  A jury could reasonably conclude defendants also knew: (1) manganese in welding fumes

can and had caused neurological damage in welders; (2) manganese exposure above TLV limits is

cumulative; (3) even welders who strictly followed the warnings would inhale some welding fumes;

and (4) exposure in most workplaces would exceed the TLV.  Based on this constellation of facts,

---

[174]  *Id*. at 764.

[175]  348 F. Supp.2d at 1054; *see also Lovick*, 588 N.W.2d at 692.  The parties debate the
significance of *Lovick* on this point.  In *Lovick*, the Iowa Supreme Court found punitive damages
appropriate after eight farmers were severely injured by a known defect in a cultivator and the
manufacturer failed to institute an adequate post-sale program to warn the approximately 35,000
farmers who owned the cultivator.  Cooley cites *Lovick* as an example of a case in which defendant's
knowledge that *some* users will certainly be severely injured satisfies the definition of willful and
wanton conduct in spite of the fact that there is a low user-to-injury ratio. Defendants attempt to
distinguish *Lovick* by arguing they did not know some welders would be severely injured.
Defendants' argument fails because their initial premise is flawed.  For the reasons explained in the
section above regarding defendants' knowledge of the risks of manganese in welding fumes, there
is substantial evidence from which a reasonable jury could conclude that defendants *did* know that
manganese in welding fumes would permanently injure some welders.

a jury could therefore also conclude defendants knew it was highly probable that *some* welders would develop neurological injuries, even though the total number of those injured might be *proportionally* low.

Defendants argue this case is analogous to *Beeman v. Manville Corp. Asbestos Disease Compensation Fund*.[176]  In *Beeman*, the Iowa Supreme Court held that punitive damages awarded against one defendant, Keene Corporation, were inappropriate in an asbestos liability case.  The Court explained that, until 1965, research regarding the harmful effects of asbestos was inconclusive.  After a landmark study in 1965 established that exposure to asbestos was dangerous, defendants and the other members of the industry placed a warning label on their products.[177]  There was, however, evidence the industry generally, and defendant Johns-Manville Corporation ("JM") specifically, knew of asbestos hazards well before 1965, and the industry concealed this information from the public.[178]   Based on this evidence, the plaintiff asserted fraud and conspiracy claims against JM, but not Keene.  For procedural reasons, only Keene faced potential punitive damages liability.[179]  The jury awarded punitive damages, but the trial court set aside the jury's award and the Iowa Supreme Court affirmed.[180]  In so holding, the Court stated:

> Even though reasonable jurors could find that the manufacturers had enough knowledge to trigger a duty to warn of the potential danger of their products, and that such failure amounted to negligence, the real issue here is conduct.  For punitive damages, a defendant's conduct must be more egregious than mere negligence; it

---

[176]  496 N.W.2d 247 (Iowa 1993).

[177]  *Id*. at 255-56.

[178]  *Id*. at 251.

[179]  *Id*. at 255 n.3.

[180]  *Id*. at 255-56.

-50-

> must amount to a willful and wanton disregard for the public's rights or safety established by a preponderance of clear, convincing, and satisfactory evidence. Iowa Code § 668A.1.  Beeman apparently agrees that punitive damages may not be assessed against Keene based on the general knowledge of the asbestos industry. Instead, there must be clear, convincing, and satisfactory evidence that sets Keene's conduct apart from that of the other asbestos manufacturers.  Merely having knowledge sufficient to initiate a duty to warn does not meet the higher standard necessary to award punitive damages.[181]

Thus, the *Beeman* Court held that evidence relating to the conduct of a co-defendant and/or the asbestos industry generally did not provide sufficient clear, convincing and satisfactory evidence that defendant Keene, specifically, willfully and wantonly disregarded the rights and safety of the public.

*Beeman* raises an important point: there must be evidence sufficient to charge *each of the individual defendants* with knowledge of a 'high probability' of harm as a result of overexposure to manganese in mild steel welding fumes.  Defendants are correct to insist upon this standard.  But Cooley has satisfied this burden.  Construed in the light most favorable to Cooley, a reasonable jury could conclude that the AWS meetings that defendants attended, and the internal memos introduced as trial exhibits and discussed above, serve as substantial evidence that *each* defendant knew that overexposure to manganese in welding fumes could cause permanent neurological injury.  Indeed, there is evidence that each defendant knew by 1994 that safe manganese levels would be exceeded in "most workplaces," not just those where welders used high-manganese electrodes.  This is substantial evidence from which a reasonable jury could conclude that defendants understood that welders in a variety of environments using a variety of products, including mild steel welding rods, would be overexposed to manganese, and that such overexposure could cause permanent neurological damage.

---

[181] *Id*. at 256.

-51-

Accordingly, construing the facts in the light most favorable to Cooley, the Court finds substantial evidence each defendant disregarded a known risk that was so great it was highly probable harm would follow.[182]

### iii.    Warnings

Defendants' last argument is that the warnings they did provide preclude a punitive damages award under Iowa law.  More specifically, defendants argue their warnings were consistent with their understanding of the risks, and complied with the applicable government and industry standards.[183]

In response, Cooley argues the Court has already held that a jury could reasonably conclude that: (1) defendants' warnings were *not* consistent with their knowledge of the risks; and (2) in fact, the warnings did *not* comply with the applicable government and industry standards.[184]

The evidence going to this issue was identical in *Jowers* and *Cooley*.  As explained in detail in both this Court's and the Fifth Circuit's opinion in *Jowers*, there is substantial evidence in the record that defendants' warnings did *not* fully comply with all of the applicable government standards.[185]  Therefore, although defendants cite *Mercer* for the proposition that punitive damages

---

[182]  *See Fell*, 457 N.W.2d at 919 (quoting Prosser & Keeton).

[183]  Cooley also argues defendants waived the government-compliance argument.  This position is not well-taken, as it is inconsistent with the approach the Court has specifically instructed the parties to use in preserving recurring issues in this MDL.

[184]  *See Jowers*, 608 F.Supp.2d at 765 ("Defendants' final argument why they are entitled to judgment on Mr. Jowers' punitive damages claim, notwithstanding the jury's verdict, is that their warnings complied with the minimum legal requirements established by OSHA; with industry standards such as those reflected by ANSI Z49.1; and with military specifications. This argument, however, is not supported by the facts or the law.").

[185]  *See Jowers*, 617 F.3d at 354 (finding, for a time, defendants weakened the warning approved by OSHA by adding "language about avoidance of "excessive" fumes and

are not appropriate under Iowa law when the manufacturer's warning complies with the applicable industry standard, the Court rejects the threshold premise of this argument.

The jury in this case could reasonably find defendants' warnings did not comply with applicable standards.  Accordingly, the Court finds substantial evidence upon which a reasonable jury could conclude defendants acted with willful and wanton disregard for Cooley's rights.

### c. Conclusion: Substantial Evidence Supports a Punitive Damages Award

For all of the foregoing reasons, the Court finds the jury's decision to award punitive damages is supported by substantial evidence.  It is worth noting, however, that this is a slightly closer question under Iowa law than it was under Mississippi law in *Jowers*.  Although "Iowa courts generally defer to a jury's award of punitive damages,"[186] the Iowa Supreme Court has expressed an increasing "willing[ness] to set aside a punitive damages award, finding defendants' conduct insufficiently egregious to support it."[187]

Ultimately, whether punitive damages are appropriate always comes down to the egregiousness of a defendant's conduct.  In this case (setting aside for a moment the nuances of Iowa law), Cooley adduced substantial evidence of egregious conduct – namely, a deliberate effort to minimize and conceal a known risk of permanent neurological harm to welders, in order to protect

---

"concentrations" of fumes that weakened the warnings, causing them to fall below the government-required minimum warning."); *Jowers*, 608 F. Supp. 2d at 765-68 (explaining three reasons defendants' warnings did not fully comply with all applicable government standards – (1) the addition of the "excessive" and "concentrations" qualifying language; (2) failure to identify "target organ effects" in the warning in compliance with the 1985 HazCom standard; and (3) failure to comply "with OSHA's more-global requirement of providing an appropriate warning about all known hazards.").

[186] *Pulla*, 882 F.Supp. at 874.

[187] *Ezzone*, 525 N.W.2d at 398.

company profits.  Although the Iowa standard for punitive damages is high, it is not so high that it asks jurors to ignore conduct that reasonably may be construed as wanton disregard for the safety of welders.  With this in mind, the standard for a Rule 50 motion is critical.  The question is *not* whether there is evidence to support defendants' position; indeed, defendants presented evidence and arguments supportive of their position throughout the trial, as they have throughout this MDL. Rather, the question is whether there is substantial evidence to support Cooley's position, and the Court must construe all of the evidence in the light most favorable to Cooley, affording him every legitimate inference regardless of whether the evidence was contradicted.[188] Here, reasonable minds could conclude substantial evidence supported Cooley's punitive damages claim, even as reasonable minds could also conclude otherwise.  Therefore, the jury's decision to award punitive damages must stand.[189]

### 2. Reduction of the Jury's Punitive Damages Award

Having found a jury could conclude that defendants' conduct was sufficient to support an award of punitive damages, the second step in the punitive damages analysis is to determine whether the *amount* of the award is constitutionally appropriate.[190]  In doing so, the Court applies federal law to assess whether the punitive damages award comports with constitutional due process.[191]  In *BMW of North America, Inc. v. Gore*, the United States Supreme Court articulated three guideposts for

---

[188]  *Top of Iowa Co-op.*, 608 N.W.2d at 466; *Woods*, 480 N.W.2d at 65 (citing *Larsen*, 300 N.W.2d at 283); *see also McClure*, 613 N.W.2d at 230.

[189]  *See Ezzone*, 525 N.W.2d at 391; *Woods*, 480 N.W.2d at 65 (explaining that "if reasonable minds could differ on the issue, it is proper to submit it" to the jury).

[190]  *Ezzone*, 525 N.W. 2d at 398-99.

[191]  *See Clark v. Chrysler Corp.*, 436 F.3d 594, 600 (6th Cir. 2006).

-54-

lower courts to use in evaluating whether a punitive damages award is excessive.[192]  These guideposts are: (1) "the degree of reprehensibility" of defendants' conduct; (2) "the disparity between the harm or potential harm suffered by [Cooley] and his punitive damages award;" and (3) "the difference between this remedy and the civil penalties authorized or imposed in comparable cases."[193]  The parties agree these three guideposts govern the analysis, but dispute their application.

The jury awarded $5 million in punitive damages, allocated among the defendants as follows:  ESAB, $1.75 million; Hobart, $1.75 million; Lincoln, $750,000; and BOC, $750,000.  The Court will analyze each guidepost to determine whether these awards were constitutionally appropriate.

### a.    Degree of Reprehensibility

In *State Farm Mutual Automobile Ins. Co. v. Campbell*, the Supreme Court clarified that the first guidepost – degree of reprehensibility – is "[t]he most important indicium of the reasonableness of a punitive damages award."[194]  The Supreme Court articulated five criteria for evaluating the degree of reprehensibility:  (1) "the harm caused was physical as opposed to economic;" (2) "the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others;" (3) "the target of the conduct had financial vulnerability;" (4) "the conduct involved repeated actions or was an isolated incident;" and (5) "the harm was the result of intentional malice, trickery, or deceit, or mere accident."[195]

---

[192]  *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559.

[193]  *Gore*, 517 U.S. at 575; *see also Phillip Morris USA v. Williams*, 549 U.S. 346, 351 (2007) (applying the *Gore* guideposts) *State Farm Mut. Automobile Ins. Co. v. Campbell*, 538 U.S. 408 (2003) (elaborating on the *Gore* guideposts).

[194]  *State Farm*, 538 U.S. at 419; *Clark v. Chrysler Corp.*, 436 F.3d 594, 600 (6th Cir. 2006) (quoting *State Farm*).

[195]  *State Farm*, 538 U.S. at 419.

### i.        Physical Harm

The harm to Cooley – permanent neurological injury – is physical.  Defendants do not dispute this point, but argue this factor is not as strong in this case as it is in cases where the plaintiff died as a result of defendant's conduct.  They cite *Clark* as an example of a wrongful death case in which the court found the punitive damages award was nonetheless excessive.[196] While defendants' argument is correct factually, and it is clear they are simply trying to make a point, the idea that 'it could be worse' is not persuasive in the context of permanent neurological injury.  This factor strongly indicates reprehensibility.

### ii.        Indifference to or a Reckless Disregard of the Health or Safety of Others

The second criterion also suggests a high degree of reprehensibility.  For the reasons discussed above, the jury was entitled to conclude defendants knew manganese in welding fumes could cause permanent neurological injury, but chose to give a less-than-candid warning in order to protect the profitability of their welding consumables business.  In addition, there is evidence defendants used "anti-warnings" and other affirmative tactics to minimize communication of the risks they knew their products posed to welders; and also evidence that the warnings did not fully comply with all government standards.

### iii.        Financially Vulnerable Target

Cooley was a union ironworker earning about $24 per hour.[197]  Accordingly, it is fair to say he is "financially vulnerable."  This factor does not weigh heavily in the reprehensibility analysis,

---

[196]  Defendants' reply brief, docket no. 272 at 18-19 (discussing *Clark*, 436 F.3d at 597).

[197]  *See* trial tr. at 1723:23.

-56-

however, given that Cooley's harm is physical, not economic.[198]

### iv.     Repeated Actions vs. Isolated Incident

In *State Farm*, the Supreme Court stated that whether the "conduct in question replicates . . . prior transgressions" is central to this reprehensibility factor.[199]  The jury found that Cooley has a neurological injury as a result of overexposure to manganese from defendants' products.  There was substantial historical evidence presented at trial relating to defendants' longstanding knowledge that overexposure to welding fumes could cause neurological injury.  Thus, this case is distinguishable from *Clark*, in which the Sixth Circuit concluded there was "no evidence that [the defendant] knew [its conduct] could cause [the plaintiff's] injury."[200]

Here, the relevant "prior transgression" is the failure to candidly warn welders that overexposure to welding fumes might cause permanent neurological injury.  Defendants argue their knowledge was evolving, reports of neurological injuries were "extremely rare," and they augmented their warnings over time to match their level of knowledge.  These arguments are not without some purchase, but they are ultimately unpersuasive.  The evidence presented at trial indicated that, prior to and during the period of time Cooley was welding, defendants repeatedly: (1) acknowledged privately that overexposure to welding fumes could cause neurological injury; but (2) chose not to warn welders of this possibility.  Accordingly, defendants had reason to know the harm Cooley suffered – neurological injury due to overexposure to manganese in welding fumes – was not an isolated incident.

---

[198] *See Clark*, 436 F.3d at 604.

[199] *See id.* (quoting *State Farm*, 538 U.S. at 423).

[200] *See id.*

-57-

## v.      Intentional Malice, Trickery, or Deceit

There is no evidence defendants *intended* to injure Cooley or other welders.  There is, however, substantial evidence they misled welders into believing the health risks associated with welding were minimal and temporary, when, in fact, defendants knew of the risk of *permanent* neurological damage.  And there is also evidence defendants were motivated to mislead welders in order to protect profitability.  Although defendants argue they were, at most, negligent when they failed to warn of potential hazards, evidence to the contrary includes: (1) defendants' use of "anti-warnings" to suggest "metal fume fever" was the only real concern for those who inhaled welding fumes; and (2) defendants' considered decisions to reject stronger warnings in order to protect profitability.  These actions are more than mere negligence.  If the jury determined defendants engaged in such conduct, then the jury could also conclude a substantial punitive damages award was justified.

Defendants also argue that "Cooley's injury could fairly be described as an 'accident' that might have been avoided had Cooley read a warning or MSDS in the last decade of his career."[201] It is true that Cooley has to accept responsibility for his own actions, and the jury recognized this with a 37% comparative negligence determination.  But defendants must also accept responsibility for their behavior, including actions they took during the earlier decades of Cooley's career that can be reasonably construed as evidence of intentional malice.  Further, the evidence was unrefuted that manganese exposure is cumulative, and individual susceptibility is always relevant, so pointing only to the last decade of Cooley's welding fume exposures is not compelling.  In sum, that defendants can legitimately blame Cooley for some of his injury does not change this analysis.  The fifth criteria

---

[201]  Defendants' reply brief, docket no. 272 at 23.

indicates reprehensibility.

<strong>vi.      Conclusion: the Factors Indicate Reprehensibility</strong>

Three of the five *State Farm* reprehensibility factors indicate defendants' conduct was reprehensible; one factor slightly favors Cooley; and one factor is essentially irrelevant. Accordingly, the first and most important of the three *Gore* guideposts indicates a sufficient degree of reprehensibility to support the jury's $5 million punitive damages award.

<strong>b.      Ratio: the Disparity between the Actual or Potential Harm and the Punitive Damages Award</strong>

The second guidepost looks to the mathematical relationship between compensatory and punitive damages.  The Supreme Court has avoided imposing a bright-line ratio between compensatory and punitive damages, but has indicated that "[s]ingle-digit multipliers are more likely to comport with due process."[202]  In this case, the ratio is single-digit.

The parties dispute the method of calculating the ratio.  Cooley argues it should be calculated as the total punitive damages award divided by the total compensatory damages award.  Defendants argue it should be calculated for each of the four defendants individually, after reducing compensatory damages by Cooley's comparative fault.  The Court concludes there is no basis for dividing the compensatory damages amount by four, and the ratio is reasonable even if it is reduced by Cooley's comparative fault.

The jury awarded $1.25 million in compensatory damages, but assigned 37% fault to Cooley, reducing the compensatory award to $787,500.  It awarded punitive damages in the total amount of $5 million, allocated among the defendants as follows:  ESAB, $1.75 million; Hobart, $1.75 million; Lincoln, $750,000; and BOC, $750,000.  Defendants argue the ratio should be calculated for each

---

[202]  *State Farm*, 538 U.S. at 424-25.

-59-

defendant individually, and the denominator should be $196,875 ($787,500 divided by four).  Using this approach, the ratios are as follows:  ESAB, 8.9:1; Hobart, 8.9:1; Lincoln, 3.8:1; and BOC, 3.8:1. If, instead, the ratio is not calculated for each individual defendant, the overall ratio is $5 million divided by $787,500, or 6.3:1.  In contrast, Cooley argues the ratio should not be calculated individually and should be measured using the *total* compensatory damages award, not reduced by comparative fault.  Using this approach, the ratio is $5 million divided by $1.25 million, or 4:1.

While the second guidepost requires more of an analysis than simply a mathematic calculation of the ratio, it is worth observing that *all* of these ratios, using all of these different approaches, are single-digit.

Furthermore, the highest ratios of 8.9:1, obtained using defendants' methodology, are misleading, because dividing the compensatory damages by four to reflect each defendant's share is an untenable approach under the circumstances.  Defendants' individual liability for compensatory damages is unknown because it is governed by a secret joint defense agreement.[203]  Therefore, it is not possible for the Court to determine if it is accurately calculating the ratio for each defendant individually.  Indeed, it is almost certain that the ratios calculated using defendants' method are *not* correct, as it is almost certain their defense agreement does not allocate 25% liability to each defendant.  Thus, for purposes of this analysis, the maximum *Gore* ratio at issue is 6.3:1.

The Supreme Court in *State Farm* explained that the egregiousness of a defendant's conduct

---

[203]  *See* trial tr. at 3174:3-17 (confirming that, due to the secret joint-defense agreement, the jury would not be instructed to allocate compensatory damages separately).  Under the joint-defense agreement, each defendant pays its own punitive damages award, but compensatory damages are allocated according to a pre-determined formula.

-60-

is relevant to determining the appropriate ratio.[204]  Therefore, the degree of reprehensibility plays a role in the analysis of the second guidepost.  Highly reprehensible conduct supports a higher ratio, and the Court has already found that a majority of the relevant factors suggest defendants' conduct was reprehensible.[205]  This supports a higher single-digit multiplier.

In addition, the Supreme Court in *State Farm* indicated that the objective amount of the compensatory damages award is also relevant to determining the appropriate ratio.[206]  The amount of compensatory damages – whether viewed as $1.25 million or $787,500 – is not large considering Cooley's circumstances.  First, his illness forced him to quit welding in 2003, depriving him of his livelihood at age 52.  Second, he will require medical treatment for the rest of his life, particularly given that his movement disorder is a progressive illness requiring increasingly intensive care and treatment.  Finally, the compensatory damages award must also serve as compensation for more intangible harms, such as loss of enjoyment.  For example, Cooley testified he is depressed and impotent, which are symptoms of manganese poisoning.  All things considered, the jury's award of compensatory damages is relatively conservative, making for a low denominator in the ratio.[207]

Accordingly, the additional factors the Supreme Court suggested in *State Farm* for

---

[204]  *State Farm*, 538 U.S. at 425-26 ("In sum, courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered.").

[205]  This refutes one of defendants' primary arguments–i.e., that their conduct was not reprehensible–and distinguishes this case from *Clark*, 436 F.3d at 597, *Bridgeport Music, Inc. v. Justin Combs Publ'g*, 507 F.3d 470 (6th Cir. 2007), and *Bach v. First Union Nat'l Bank*, 486 F.3d 150 (6th Cir. 2007).  *See* Punitive damages motion, docket no. 258 at 25.

[206]  *State Farm*, 538 U.S. at 425-26.

[207]  In comparison, the jury in another *Welding Fume* MDL case awarded $17.5 million in compensatory damages to the welder-plaintiff, and also awarded $3 million to his wife for loss of consortium.  *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 667 (6th Cir. 2010).

-61-

determining what ratio might be appropriate make this a case in which a ratio in the high single-digits is not constitutionally suspect.[208]  Unlike *State Farm*, this is not a case involving purely economic harm, in which the compensatory award fully repairs the damage.[209]  Nor is it a case like *Romanski v. Detroit Entm't, L.L.C.*, in which punitive damages will automatically exceed the single-digit multiplier because the compensatory damages are merely a nominal sum in recognition of an injury difficult to quantify in monetary terms.[210]  Instead, this case involves: (1) a significant but ultimately conservative compensatory damages award; (2) a permanent and progressive, acute physical injury; (3) conduct the jury found reprehensible; and (4) a punitive damages award that falls within a single-digit ratio.

The Court's duty in assessing the constitutionality of a punitive damages award is to "ensure

---

[208]  *State Farm*, 538 U.S. at 425.

[209]  *State Farm*, 538 U.S. at 426.  In *State Farm*, the *Gore* ratio was a startling 145:1 ($145 million in punitive damages and $1 million in compensatory damages).  *Id*.  The Supreme Court described the nature of the compensatory damages as follows:

> The compensatory award in this case was substantial; the Campbells were awarded $1 million for a year and a half of emotional distress. This was complete compensation. The harm arose from a transaction in the economic realm, not from some physical assault or trauma; there were no physical injuries; and State Farm paid the excess verdict before the complaint was filed, so the Campbells suffered only minor economic injuries for the 18-month period in which State Farm refused to resolve the claim against them. The compensatory damages for the injury suffered here, moreover, likely were based on a component which was duplicated in the punitive award.

*Id*.

[210]  *Romanski v. Detroit Entm't, L.L.C.*, 428 F.3d 629, 645-46 (6th Cir. 2005) (discussing the reprehensibility and compensatory amount factors from *State Farm* in the context of cases in which the compensatory damages are necessarily very low or nominal such that the punitive damages award will exceed a single-digit ratio without violating due process); *Argentine v. United Steel Workers of Am. AFL-CIO*, 287 F.3d 476, 488 (6th Cir. 2002); *Wolf*, 690 N.W.2d at 895 (the Iowa Supreme Court found that a $25,000 punitive damages award was not constitutionally excessive, where plaintiff only asked for and received $1 in compensatory damages, citing *State Farm*, 538 U.S. at 424-26 and *Gore*, 517 U.S. at 582).

-62-

that a punitive damages award actually achieves the twin purposes of punishment and deterrence."[211]

Here, the Court finds that, even if the ratio is calculated after reducing compensatory damages by comparative fault,[212] the ratio of punitive to compensatory damages is not excessive.  The second *Gore* guidepost, therefore, does not prescribe a reduction in the jury's punitive damages award.

### c.        Sanctions for Comparable Conduct

The third *Gore* guidepost is the least helpful to the Court's analysis in this case.  The due process analysis revolves around the requirement that defendant has fair notice of potential exposure to liability.[213]  In *Gore*, the Supreme Court stated that a "reviewing court engaged in determining whether an award of punitive damages is excessive should accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue."[214]  In this products liability lawsuit, these sophisticated defendants cannot claim to be unaware of the prospect that they could

---

[211] *Id*. at 649.

[212] *See Bridgeport Music, Inc.*, 507 F.3d at 489 n.13 (noting it was unnecessary to resolve the basis for calculating the ratio because the difference would not change the result).  How to calculate the *Gore* ratio is not settled in the Sixth Circuit.  *See Clark*, 436 F.3d at 607 n.16, 613, 620 n.3.  In *Clark*, the panel disagreed whether to reduce the compensatory award based on comparative fault before calculating the *Gore* ratio.  *Id*.  One judge said yes, one said no, and one said it was not necessary to decide.  *Id*.  The Iowa Supreme Court has expressly held that statutory comparative fault principles "have no application to a claim for punitive damages."  *Reimers v. Honeywell, Inc.*, 457 N.W.2d 336, 339 (Iowa 1990) (quoting *Godbersen v. Miller*, 439 N.W.2d 206, 209 (Iowa 1989)).

[213] *Romanski*, 428 F.3d at 648 (citing *Gore*, 517 U.S. at 584 and *State Farm*, 538 U.S. at 428 and explaining that "[t]he purpose of this guidepost reflects an elementary principle of due process – namely, that defendant must have been provided "fair notice" that its conduct would subject it to a penalty on the order of the punitive damages award.").

[214] *Gore*, 517 U.S. at 583 (internal quotation marks and citations omitted).

-63-

be subject to a punitive damages award as a result of conduct that causes harm to consumers.[215]

Indeed, Iowa statutory law expressly provides for punitive damages, without a cap,[216] and the "legal malice" standard for punitive damages in Iowa has been in place since before Cooley started welding.[217]  This indicates that the third guidepost supports the jury's award.

Defendants argue that the punitive damages award is excessive because:  (1) OSHA has never found a violation; and (2) civil penalties under OSHA would be limited to approximately $70,000, the maximum fine per violation.  They base this argument on the conclusion that OSHA would treat inadequate warning labels as a single violation.[218]  Cooley responds that, to the extent OSHA fines are relevant, OSHA could impose a fine for each inadequately labeled canister of welding rods he used, which would amount to significantly more than $5 million in fines.[219]

Because OSHA has never found a violation or fined defendants, analysis of this issue is necessarily speculative.[220]  Upon review of all of the authorities cited by the parties – including

---

[215]  *See e.g.*, *Cambio Health Solutions L.L.C. v. Reardon*, 234 Fed. Appx. 331, 339-40 (6th Cir. 2007) (rejecting defendant's argument that the punitive damages award was excessive because the statutory penalty would be approximately half of the $5 million punitive damages award, reasoning that defendants were aware that the plaintiffs could opt to pursue punitive damages under Tennessee common law instead of statutory damages).

[216]  Iowa Code § 668A.1(1)(a) (codified in 1987).

[217]  *See Meyer v. Nottger*, 241 N.W.2d 911 (Iowa 1976) (citing Iowa punitive damages cases applying the legal malice standard dating back to 1953); *see generally* Dorsey D. Ellis, Jr., PUNITIVE DAMAGES IN IOWA: A CRITICAL ASSESSMENT 66 Iowa L. Rev. 1005 (1980-1981).

[218]  Punitive damages motion, docket no. 258 at 28-29; defendants' reply brief, docket no. 272 at 28-30.

[219]  Response brief, docket no. 266 at 35-37.

[220]  The defendants argue, at least implicitly, that since OSHA has never found a violation for failure to warn, the relevant comparison to civil and criminal fines should be $0.  That OSHA has never imposed a fine does not mean it could not, however, and there is certainly evidence that defendants' warnings were inconsistent with certain government standards.

OSHA's statutes, regulations, and an interpretation letter – it is not clear whether OSHA could or would impose a fine: (1) for each inadequately-labeled canister of welding fumes; or (2) for each time OSHA visited a defendant's facility and found canisters with inadequate warning labels; or (3) once per defendant.  Accordingly, the arguments regarding OSHA fines do not contribute meaningfully to the analysis of whether the punitive damages award is excessive.  And, in light of the Sixth Circuit's recognition in *Cambio* that common law punitive damages are a known risk, what OSHA might do is of limited relevance.[221]

Ultimately, comparison of the punitive damages award to the civil and statutory penalties does not contribute much to the due process analysis.

### d. Summary of *Gore* Guideposts Analysis: the Punitive Damages Award Is Not Constitutionally Excessive

Applying the *Gore* guideposts to the facts of this case indicates the following: (1) there is evidence of conduct that can be characterized as highly reprehensible – particularly, evidence of willingness to sacrifice customers' safety in order to preserve profitability; (2) the single-digit ratio of punitive damages to compensatory damages is not unjustifiably large, given the high degree of reprehensibility and a not-excessive compensatory damages award; and (3) under the circumstances, defendants were aware of their potential exposure to a punitive damages award, and a comparison to legislative sanctions for comparable conduct does not contribute meaningfully to the analysis.

In conclusion, the Supreme Court has stated clearly that: (1) due process review of punitive damages awards is a fact-specific, case-by-case inquiry – "there are no rigid benchmarks that a punitive damages award may not surpass;" and (2) the degree of reprehensibility is the "most

---

[221]  *Cambio*, 234 Fed. Appx. at 339-40.

important indicium of the reasonableness of a punitive damages award."[222]  Based on these overarching principles and a complete review of the *Gore* guideposts, the Court finds the $5 million punitive damages award comports with constitutional due process.

### E.  RULING: DEFENDANTS' PUNITIVE DAMAGES MOTION IS *DENIED*

For all of the foregoing reasons, defendants' renewed motion for judgment as a matter of law on plaintiffs' punitive damages claim or, in the alternative, for reduction of the punitive damages awards (docket no. 258) is **DENIED**.

## III.  COOLEY'S MOTION FOR ATTORNEYS' FEES & EXPENSES

The second motion pending before the Court is Cooley's motion, pursuant to Rule 54(d)(2) of the Federal Rules of Civil Procedure and Iowa common law, requesting recovery of reasonable attorneys' fees and expenses.[223]  For the reasons explained below, the Court will not award fees.

### A.  APPLICABLE PROCEDURES[224]

Rule 54(d)(2) of the Federal Rules of Civil Procedure sets forth the procedure for seeking recovery of attorneys' fees.  The party seeking fees must file a timely motion stating:  (1) the

---

[222]  *State Farm*, 538 U.S. at 419, 425 (quoting *Gore*, 517 U.S. at 575).

[223]  Plaintiff's motion for attorneys' fees and expenses, docket no. 255; *see also* defendants' brief in opposition, docket no. 262, and Cooley's reply brief, docket no. 267.
In addition, defendants filed a motion for leave to file a surreply, and incorporated the proposed surreply into the motion, docket no. 269.

[224]  Defendants argue Cooley's motion for attorneys' fees and costs is procedurally defective for several reasons.  The Court need not resolve these procedural arguments, however, because, for the reasons discussed below, it finds that Cooley has not satisfied the high standard for an award of fees in any event.  One of the procedural arguments concerns the propriety of defendants' surreply, docket no. 269.  Because Cooley's motion for attorneys fees is denied, defendants' motion for leave to file surreply, docket no. 269, is moot.

grounds for the requested award; and (2) the amount requested, or a fair estimate of it.[225]  If a party requests briefing on the motion, the Court will entertain it, and then issue findings of fact and conclusions of law.[226]

### B.    APPLICABLE LAW & STANDARD

Because this is a diversity case, Iowa law provides the standard for determining whether Cooley is entitled to recover his attorneys' fees from defendants.[227]

The question of attorneys fees is within the equitable power of the court; it is *not* a question for the jury.[228]  In keeping with the "American Rule," the general rule in Iowa is that attorneys' fees are not recoverable "in the absence of a statute or contract authorizing such an award."[229]  Iowa common law, however, recognizes a narrow exception to this rule.  The trial court may award attorneys' fees to the prevailing party when the opposing party's conduct is "oppressive" or "conniving."[230]  In *Hockenberg Equipment Co. v. Hockenberg's Equipment & Supply Co. of Des Moines, Inc.*, the Iowa Supreme Court defined "oppressive" conduct as "conduct that is difficult to

---

[225]  Fed. R. Civ. P. 54(d)(2)(A)-(B).

[226]  Fed. R. Civ. P. 54(d)(2)(c).

[227]  *See Burlington N. R. Co. v. Farmers Union Oil Co. of Rolla*, 207 F.3d 526, 534 (8th Cir. 2000); *see also Jowers*, 608 F. Supp. 2d at 775-76, n.251 (discussing the *Erie* doctrine's application to the question of attorneys' fees and noting, with citations, that "*every federal appellate court agrees* that, "[i]n diversity cases such as this one, state law governs the award of attorneys' fees.").

[228]  *See Hockenberg Equip. Co. v. Hockenberg's Equip. & Supply Co. of Des Moines, Inc.*, 510 N.W.2d 153, 159 (Iowa 1993)

[229]  *Capital Fund 85 Ltd. P'Ship v. Priority Sys., LLC*, 670 N.W.2d 154, 160 (Iowa 2003).

[230]  *See Hockenberg*, 510 N.W.2d at 158-60 (stating that attorneys' fees are appropriate when conduct of the opposing party "rise[s] to the level of oppression or connivance to harass or injure another," and identifying *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240 (1975) as the source of this exception).

bear, harsh, tyrannical, or cruel;" and "connivance" as "voluntary blindness [or] an intentional failure to discover or prevent the wrong."[231]  "These terms envision conduct that is intentional and likely to be aggravated by cruel and tyrannical motives.  Such conduct lies far beyond a showing of mere 'lack of care' or 'disregard for the rights of another.'"[232] In other words, it is a distinctly higher standard of culpability than that required for punitive damages.[233]

The "oppressive or conniving" standard is not disputed.  Defendants contend, however, the oppression or connivance must occur within the context of litigation conduct, not the conduct that led to the claims in the complaint.  Because Cooley does not argue (nor could he argue) that defendants engaged in "oppressive or conniving" litigation tactics during this lawsuit, this is a threshold issue.

Defendants advance three arguments in support of their contention that only litigation conduct is relevant to the question of attorneys' fees.  First, they argue *Alyeska Pipeline* and the principles underlying the American Rule mandate limiting common law attorneys' fees to the circumstances surrounding the litigation of the case itself.  Second, they argue case law – from the United States Supreme Court, the Sixth Circuit, and Iowa – supports their position.  And third, they argue it would be inappropriate for the Court to act "in the role of the jury over which it presided" by making its own factual findings regarding whether defendants conduct was "conniving or oppressive."

---

[231] *Hockenberg*, 510 N.W.2d at 159 (citing Black's Law Dictionary 1093 (6th ed. 1990) and The American Heritage Dictionary 872 (2d College ed. 1985)); *see also Williams v. Van Sickel*, 659 N.W.2d 572, 579 (Iowa 2003) (quoting *Hockenberg*, 510 N.W.2d at 159).

[232] *Hockenberg*, 510 N.W.2d at 159.

[233] *Id*. at 159.

-68-

The fundamental flaw with all of defendants' arguments is that they are not supported by Iowa law, the only law binding under the circumstances.[234] *Alyeska Pipeline*, Sixth Circuit law, and federal common law regarding the American Rule are persuasive authority, but cannot abrogate inconsistent Iowa law.[235] Defendants argue Iowa courts "have not directly addressed this issue."[236] Defendants are wrong. Iowa courts have clearly awarded attorneys' fees for non-litigation-related "oppressive or conniving" conduct; that is, conduct that forms the basis of the claims in the lawsuit.[237]

*Hockenberg* also refutes defendants' argument that the trial court must refuse to act "in the role of the jury over which it presided" by making its own factual findings regarding whether defendants' conduct was "conniving or oppressive." As part of its analysis clarifying the

---

[234] In a footnote, defendants assert that, assuming there is a conflict between Iowa and federal law on the issue of attorneys' fees, federal law would apply under the *Erie* doctrine. Defendants acknowledge, however, that the Court has already fully analyzed and rejected this argument in *Jowers*. The Court again rejects this argument for the reasons set forth in the *Jowers* opinion, which are fully incorporated herein. *Jowers*, 608 F.Supp.2d at 775-77.

[235] In addition to *Alyeska Pipeline*, 421 U.S. at 258-59, defendants cite *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991), as United States Supreme Court authority indicating that a federal court may impose attorneys fees for improper litigation conduct. They cite *Shimman v. Int'l Union of Operating Eng'rs, Local 18*, 744 F.2d 1226, 1230-31 (6th Cir. 1984) (*en banc*), for the proposition that, in the Sixth Circuit, attorneys' fees are *not* recoverable for "bad faith in the acts giving rise to the substantive claim."

[236] Defendants' opposition brief, docket no. 262 at 7, n.3 (citing *Am. Family Mut. Ins. Co. v. Miell*, 569 F. Supp. 2d 841, 860 (N.D. Iowa 2008); *Harris v. Short*, 115 N.W.2d 865, 867 (Iowa 1962)).

[237] *See Hoeppner v. Holladay*, 2007 WL 2963662 at *5 (Iowa Ct. App. Oct. 12, 2007) (awarding attorneys' fees when a con-man "connived" to divest a woman, with whom he had a physical relationship, of her home); *Kline v. Keystar One, L.L.C.*, 2002 WL 681237 at *7 (Iowa Ct. App. Apr. 24, 2002) (awarding attorneys' fees when defendant-partner sold property owned by partnership without permission or knowledge of other partners). Neither the *Hoeppner* nor *Kline* courts made any suggestion that the fee awards were related to litigation-related conduct.

-69-

"oppressive or conniving" standard for common law attorneys' fees, the *Hockenberg* court stated:

> the determination of an attorney fee award lies within the equitable power of the court, *Alyeska Pipeline*, 421 U.S. at 257-58 n.30 . . ., and the court should not delegate its equitable power to the jury. 27 Am.Jur.2d *Equity* § 239, at 802 (1966) ("[I]f a question is one that is peculiarly proper for the court of equity to determine for itself, it should not be submitted to a jury . . . .").[238]

In other words, Iowa law *requires* the Court – not a jury – to decide the question of attorneys' fees.

Accordingly, the Court finds Iowa law does not limit common law attorneys' fee awards to the context of litigation conduct, and that resolution of the question is for the undersigned.[239]

## D.    ATTORNEYS' FEES & EXPENSES ANALYSIS

The "oppressive or conniving" conduct standard for attorneys' fees is clearly and critically higher than the legal malice standard for punitive damages.[240]  As noted, the trial court may only award attorneys' fees to the prevailing party when the opposing party's conduct is "oppressive" or "conniving."[241]  Iowa law expressly requires intentional conduct "far beyond a showing of mere 'lack of care' or 'disregard for the rights of another.'" It "envision[s] conduct that is intentional and likely to be aggravated by cruel and tyrannical motives."[242]

The handful of Iowa cases awarding attorneys' fees illustrate that this is truly a high

---

[238]  *Hockenberg*, 510 N.W.2d at 159.

[239]  Defendants cite Iowa cases in which the court awarded attorneys' fees based, at least in part, upon litigation conduct.  *See Markey v. Carney*, 705 N.W.2d 13, 26 (Iowa 2005); *Williams v. Van Sickel*, 659 N.W.2d 572, 581 (Iowa 2003).  Ultimately, these cases merely stand for the proposition that litigation conduct can form the basis of an award, not the more limited corollary that *only* litigation conduct can support an attorneys' fee award.

[240]  *See Hockenberg*, 510 N.W.2d at 159.

[241]  *See id*. at 158-60.

[242]  *Id*. at 159.

standard, and fees are reserved for extraordinary circumstances.  *Hoeppner v. Holladay* is a classic case of connivance.[243]  A widow sought assistance in managing real estate from the defendant, a friend of her deceased husband.  Instead of helping her, defendant seduced her and then orchestrated a series of transactions to take her home from her.  The Iowa Court of Appeals upheld the attorneys' fee award, explaining:

> Deprivation of a home for a widow in her mid-fifties with whom he had a physical relationship of a reasonably long duration, who trusted his word, and was deceived into believing that the Wilton home was hers, with or without him, is sufficiently vexatious, tyrannical, cruel, and oppressive to affirm the common law attorney fee award to Thelma.[244]

Similarly, in *Kline v. Keystar One, L.L.C.*, the Iowa Court of Appeals upheld an award of attorneys' fees.[245]  The plaintiffs in *Kline* were the limited partners in a partnership.  The general partner sold partnership property without telling the limited partners.  The defendants who appealed the attorneys' fee award took the property from the general partner as satisfaction for a personal debt, even though they knew the property was owned in partnership and there were limited partners.  The defendants turned a blind eye by failing to contact the limited partners or investigate the status of the partnership, and then exercised control and accepted income from the property without informing the limited partners.  The Iowa Court of Appeals held this conduct constituted "vexation and oppression" of the limited partners, and upheld the attorneys' fee award.[246]

---

[243]  *Hoeppner*, 2007 WL 2963662, at *5.

[244]  *See id.*

[245]  *Kline*, 2002 WL 681237, at *7.

[246]  *Id.*

-71-

A third illustrative case is *Williams v. Van Sickel*,[247] where an elected official forged letters to taxpayers and fabricated trial exhibits, in an effort to win a lawsuit against the taxpayers and overcome their counterclaims.  The Iowa Supreme Court upheld the attorneys' fee award against the official, observing: ""[i]t is hard to imagine behavior that would be more oppressive or conniving than a public official creating documents which benefit herself to the detriment of those she is elected to represent." Equally oppressive and conniving was her attempt to defraud the [trial] court in her scheme to protect herself from liability.""[248]

*Hoeppner*, *Kline*, and *Williams* represent the very small minority of Iowa cases; in the great majority of cases, Iowa courts held the high standard for awarding attorneys' fees was not met.[249] An example involving particularly egregious conduct in which an Iowa court *denied* fees is *In re Critser Testamentary Trust*.[250]  The plaintiff in *Critser* was the beneficiary of a trust fund created upon his mother's death, when he and his brother were less than ten years old.  The trustee of the fund never told the boys about the trust, deluding them into believing the support she provided was from her personal funds.  She also used the trust as her "slush fund," failed to use trust funds to provide needed financial support when the boys were living with their father, and egregiously mismanaged the trust by failing to keep records, file court documents, and close the trust when the boys became adults.  In addition, when the boys found out about the trust, she tried to get them to

---

[247]  *Williams v. Van Sickel*, 659 N.W.2d 572 (Iowa 2003).

[248]  *Id.* at 580.

[249]  *See, e.g.*, *Hockenberg*, 510 N.W.2d at 160; *Wolf*, 690 N.W.2d 887.  *Hockenberg*, the seminal case on the standard for common law attorneys' fees in Iowa, provides a good example of a typical Iowa case denying the request for fees.  *Hockenberg*, 510 N.W.2d at 155-160.

[250]  2002 WL 987638 (Iowa App. Ct. May 15, 2002).

-72-

remain silent regarding her actions.[251]   Despite these egregious lies, self-dealing, and trickery, the Iowa Court of Appeals found the trustees' actions justified punitive damages, but did not support an award of attorneys' fees.[252]

If the Iowa courts will not award attorneys' fees in a case like *Critser*, then this Court cannot award attorneys' fees in this case.  While the Court has found that the evidence regarding defendants' conduct was sufficient to support a punitive damages award, it finds that same evidence insufficient to justify an award of attorneys fees.  The Court simply cannot characterize defendants' actions as "oppressive" or "conniving," and finds no evidence of a specific intent to injure Cooley. Indeed, it is telling that Cooley has not cited an Iowa case where the court awarded attorneys' fees based on conduct analogous to that at issue here. The remarkably high standard for attorneys' fees has led to a paucity of Iowa cases upholding a common law attorneys' fee award.  The overarching theme in the Iowa case law is that the standard is truly as high as it appears from the plain meaning of "oppression or connivance to harass or injure another."[253]

Accordingly, Cooley's motion for attorneys' fees and expenses, docket no. 255, is **DENIED**.

## IV.  **BOC'S MOTION FOR JUDGMENT AS A MATTER OF LAW ON CAUSATION**

BOC, along with the other defendants, made an oral motion for judgment as a matter of law at the close of Cooley's case.[254] BOC is the only defendant who filed a renewed motion for judgment

---

[251]  *Id*. at *2.

[252]  *Id*. at *3.

[253]  *Hockenberg*, 510 N.W.2d at 160.

[254]  *See* trial tr. at 1838:22-1845:7.

as a matter of law pursuant to Rule 50(b).[255]  BOC's renewed motion is limited to the issue of causation – that is, BOC argues that no reasonable jury could find substantial evidence Cooley's exposure to welding consumables *manufactured by BOC* was a substantial factor in causing his injuries.

### A.  THE APPLICABLE STANDARD FOR BOC'S MOTION FOR JUDGMENT AS A MATTER OF LAW ON CAUSATION

The applicable standard for BOC's motion for judgment as a matter of law on the issue of causation is the same as the standard articulated above for defendants' punitive damages motion: (1) Iowa law applies;[256] (2) Iowa courts apply the "substantial evidence" standard for judgment as a matter of law; and (3) the Court must afford Cooley every legitimate inference that can be drawn from the evidence, and construe the evidence in the light most favorable to Cooley, even if the evidence was contradicted.[257]  Specifically, the Iowa Supreme Court has said proximate cause is a "factual issue[ ] . . . for the jury to resolve, and only in exceptional cases may we decide [it] as a matter of law."[258]  The Court must uphold the jury's verdict if reasonable minds could disagree as to whether substantial evidence supported the causation element of Cooley's claims.[259]

### B.  ANALYSIS OF BOC'S MOTION FOR JUDGMENT AS A MATTER OF LAW

---

[255]  BOC's renewed motion for judgment as a matter of law, docket no. 256.

[256]  *See Mannix*, 348 F.3d at 531.

[257]  *See St. Paul's Evangelical Luthern Church*, 766 N.W.2d at 798; *McClure*, 613 N.W.2d at 230; *Top of Iowa Co-op.*, 608 N.W.2d at 466; *Woods*,  480 N.W.2d at 65 (citing *Larsen*, 300 N.W.2d at 283).

[258]  *City of Cedar Falls v. Cedar Falls Cmty. Sch. Dist.*,617 N.W.2d 11, 16 (Iowa 2000); *see also Lovick*, 588 N.W.2d at 700 (stating causation should only be decided as a matter of law in "extraordinary cases").

[259]  *See Scroggins v. Wal-Mart Stores, Inc.*, 560 N.W.2d 564, 566 (Iowa 1997).

1.      **Proximate Cause under Iowa Law**

In *Lovick*, the Iowa Supreme Court explained that a "plaintiff in a products liability action must establish a causal relationship between the alleged negligence and injury . . . . This requires a showing that the manufacturer's conduct was a substantial factor in the injury."[260] Thus, Iowa law requires Cooley to establish that exposure to BOC's product – and not simply unidentified welding rods – was a "substantial factor" in causing his movement disorder.[261]

In *City of Cedar Falls*, the Iowa Supreme Court fleshed out the meaning of "substantial factor" as follows:

> On this issue, we look to the proximity and foreseeability of the harm flowing from the actor's conduct.  If upon looking back from the injury, the connection between the negligence and the injury appears unnatural, unreasonable, and improbable in the light of common experience, such negligence would be remote rather than proximate cause.  If, however, by a fair consideration of the facts based upon common human experience and logic, there is nothing particularly unnatural or unreasonable in connecting the injury with the negligence, a jury question would be created.[262]

There are a number of appropriate factors to consider in the substantial factor analysis, including: "(1) exposure to a specific product; (2) on a regular basis; (3) over some extended period of time; (4) in proximity to where the plaintiff actually worked."[263] Whether a particular defendant's product

---

[260]  588 N.W.2d at 700.

[261]  *See Spaur v. Owens-Corning Fiberglass Corp.*, 510 N.W.2d 854, 858 (Iowa 1994).

[262]  *City of Cedar Falls*, 617 N.W.2d at 17 (omitting citations and quotations).

[263]  *Perrin v. Owens-Corning Fiberglass Corp.*, 871 F.Supp. 1092, 1095 (N.D. Iowa 1994), *aff'd*, 68 F.3d 1122 (8th Cir. 1995).  The source of these factors is the Fourth Circuit's well-known causation analysis in *Lohrmann v. Pittsburg Corning Corp.*, 782 F.2d 1156, 1163 (4th Cir. 1986). In *Lohrmann*, the Fourth Circuit held: "To support a reasonable inference of substantial causation from circumstantial evidence, there must be evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked." *Lohrmann*, 782 F.2d at 1162-63.  The parties engage in a tepid debate regarding the applicability of *Lohrmann*, but essentially agree that, in Iowa, it is *not* a "rigid test," but merely "used to analyze

-75-

is a substantial factor in causing the injury remains a case-specific inquiry, however.[264]  Furthermore,

a product defect need only be "*a* proximate cause, not *the* proximate cause."[265]  In sum, the issue is

whether the connection between Cooley's neurological injury and BOC's product appears

"unnatural, unreasonable, and improbable" in light of common experience.

### 2.  Summary of Evidence Relating to Product Exposure

Cooley testified he used welding consumables manufactured by BOC.[266]  Cooley's co-

worker, Bruce Mabis, testified he used BOC's welding consumables on job sites where he and

Cooley worked.  And each party's industrial hygienist testified regarding the extent of Cooley's

exposure to welding fumes over the course of his career.  What follows is a summary of the evidence

adduced at trial relating to Cooley's use of BOC's welding consumables.

---

the sufficiency of the evidence needed to satisfy the substantial factor requirement."  *Spaur*, 510 N.W.2d at 859.  In *Spaur*, the Iowa Supreme Court made clear that it would use the *Lohrmann* factors as guideposts rather than adopt the test as Iowa law.  *Id*.  Thus, the Iowa standard is more lenient than the *Lohrmann* test.  *See* Julie Offerman, *"The Dose Makes the Poison": Specific Causation in Texas Asbestos Cases after Borg-Warner*, 41 Tex. Tech. L. Rev. 709, 721-22 n.118 (Winter 2009) (citing *Spaur*, 510 N.W.2d at 858-59, as an example of more lenient approach than the *Lohrmann* test).  Iowa's leniency is noteworthy because, in its motion, BOC quotes this Court's analysis of causation and product exposure in *Byers v. Lincoln Elec. Co.*, 607 F.Supp.2d 840, 860 (N.D. Ohio 2009), in support of its argument that Cooley's exposure was insufficient.  In *Byers*, however, the Court was applying Texas law, and, specifically, the very stringent test set forth in *Borg-Warner Corp. v. Flores*, 232 S.W.3d 765 (Tex. 2007).  *See* Offerman at 721 (characterizing the *Borg-Warner* standard as one of the most stringent in the nation).  Accordingly, much of the Court's analysis in *Byers* is not applicable here.

[264]  *Spaur*, 510 N.W.2d at 859.

[265]  *Lovick*, 588 N.W.2d at 700 (emphases added); *Summy v. City of Des Moines*, 708 N.W.2d 333, 342 n.5 (Iowa 2006).

[266]  Cooley and the other witnesses generally refer to BOC as "Airco" in their testimony.  It is undisputed that Airco stopped manufacturing welding consumables by 1986, but BOC is the successor to Airco.  Accordingly, for purposes of the product identification discussion, BOC is synonymous with Airco.

-76-

### a.      Cooley's Testimony regarding Use of BOC Products

After explaining he was a pre-apprentice and apprentice ironworker during the period around

1979-1982, Cooley testified as follows:

> Q.      Okay.  During that time period, did you do welding?
> A.      Yes.
> Q.      And do you recall whose products you used when you were welding as a preapprentice and an apprentice?
> A.      Yes.  As a preapprentice and an apprentice on different job sites that I went, I remember Airco very vividly because I was working for J and J Steel Erectors, and what our job was was to go ahead, and the particular crew I worked on, it was called setting iron.  If a factory was building an expansion, we'd go in, our crew would go in and set the iron and then put the bar joists in and the bridging and doing the welding that needed to be done, and then we would leave that area and go to another job site.  And that particular foreman for some reason took a liking to me, always had me doing the rigging, and he was teaching me how to read the blueprints.  So he spread the blueprints on the hood of the truck and set a welding box on it so they wouldn't blow away, and he'd basically turn it over to me, but he'd be there watching me.  And I would look on the blueprints to see which number on the beam, go rig it, and send it up to the connectors.
> Q.      So you remember these Airco boxes.  Do you remember using Airco rods?
> A.      Yes.
> Q.      Do you remember using any rods manufactured by any other company during your time as a preapprentice or as an apprentice from roughly '79 to '85?
> A.      Yes.  We used – when I worked for Foster over at Alcoa.  I actually went to work for the gentleman that was just on the – he was my foreman, and we used Lincoln rods.
> Q.      Okay.  Anybody else?  Airco and Lincoln.
> A.      That's the ones I – I mean there might have been other manufacturers, but that's the two I remember at that time, yes.[267]

Later in his testimony, Cooley twice reiterated he used BOC/Airco welding rods around 1980.  First

on, cross-examination, he testified as follows:

> Q.      And is it fair to say, sir, that you were doing more than just welding in 1980?
> A.      Yes.
> Q.      And you have identified and said that some of the time during that time period you would have used Airco rods.  Is that right?

---

[267]  *See* trial tr. 727:1-728:10.

A. What's the time frame?

Q. Around 1980.

A. When I was working for J and J steel, we used Airco rods.

Q. Okay.  And my question for you, you didn't use Airco rods exclusively though, did you?

A. For J and J steel?

Q. Right.

A. Most of the time we did for the crew that I was on, yes.

Q. Okay.  And so how many hours do you think that would account for?

A. I have no idea.  That's 30 years ago.

Q. That's fair enough.  I'm just making sure we get it as accurately as we can.  And when you were doing work at the Alcoa plant, I think you have explained to us that wouldn't have involved – did that involve work with J and J?

A. No.

Q. Okay.  And so that wouldn't have involved the use of any of those Airco rods, right?

A. I'm not saying that J.M. Foster and the other contractors that I worked for at Alcoa didn't use Airco rods.  I don't remember them not using – or – I don't remember using them, you know, and saying, yes, I saw the box and I took them out, no.

Q. That's very fair.  And that's what I want to establish, Mr. Cooley, was that if we're looking at it trying to be as accurate as possible, you can't tell us during that period of time when you were working at the Alcoa plant whether or not you used Airco rods.  Fair?

A. That's fair, yes.

Q. And so the best you can do is say that some portion of the rods from J and J might have been Airco rods?

A. Yes.

Q. Okay.

A. That portion that I used for J and J were Airco rods on that crew, yes.

Q. All right.  And as a percentage of your total lifetime of work, that portion would have been a very slight percentage of your total lifetime of work; fair enough?

A. Of everything that I welded in my full – yes.

Q. And that would have been back in the early 1980s?

A. Yes.

Q. And specifically for J and J would have been around 1980; is that right?

A. I worked for J and J from, like, '80 up until – I didn't work for them exclusively, for J and J, but I worked for them a lot in the early '80s, and then I also worked for them again in the '90s a little bit.[268]

---

[268] *See* trial tr. at 810:22-813:2.

-78-

On re-direct examination, Cooley testified:

> Q.     '79 to 1985 you are an ironworker?
> A.     Correct.
> Q.     You were using Lincoln rods, right?
> A.     Yeah, a lot of them.
> Q.     You were using Airco rods, right?
> A.     Correct.[269]

He also named some of the product numbers of the welding rods he used:

> Q.     And Mr. Cooley, you testified earlier about Lincoln, Hobart, ESAB, and Airco welding rods.
> A.     Yes.
> Q.     And can you tell the jury which types of rods you used?  We've heard some number thrown around yesterday, I think with Mr. Peters, about 7018s.  And do you recall what types of rods you used?
> A.     Yeah.  I used what they call P5, I've used 7018, 6010, 6011, 7014.
> Q.     And to your knowledge, those are all rods manufactured by the defendants, the companies that you just named, correct?
> A.     Correct.[270]

And Cooley testified as follows regarding Airco's warning label:

> Q.     Let me show you a couple of the warning labels.  The first one is – it is by Airco – Heidi, this is MDL-AIW 81.  Did you see the warning and the label, Mr. Cooley?
> A.     Yes.
> . . .
> Q.     And do you recognize this to be the label or one similar to the ones that you were seeing on Airco products in 1979, 1980?
> A.     Yes, it looks like it.
> Q.     Is the language familiar to you?
> A.     Yes, it is.[271]

The period of Cooley's career at issue in BOC's motion is 1979-1985.  Cooley's expert

industrial hygienist, David Kahane, testified "it is clear that Mr. Cooley was in and around welding

---

[269] *See* trial tr. at 898:20-25.

[270] *See* trial tr. at 744:12-24.

[271] *See* trial tr. at 750:3-6, 750:19-24.

throughout his career . . . but his greatest welding activities and his most challenging ones were from the period of 1979 to 1985 . . . . So those are what I would call the heaviest exposure periods."[272]

Cooley testified as follows with regard to this portion of his career:

> Q. And in 1979 you became a preapprentice welder; is that correct, sir?
> A. A preapprentice ironworker.
> Q. A preapprentice ironworker. Thank you. And then in 1980, you started your apprenticeship; is that fair?
> A. Yes.
> Q. And that lasted right up to 1985, and you got your journeyman's certificate, but then they ran out of work. Is that correct, sir?
> A. Correct.
> Q. Okay. And in the middle of that, in about 1982, you took a course to be a journeyman welder; is that correct, sir?
> A. Yeah. In our apprenticeship program we had a welding course, yes.[273]

He also explained the relative amount of welding he did during different stages of his career, stating "when I was a preapprentice, I welded a lot."[274]

### b.  Mr. Mabis' Co-Worker Testimony

Cooley's co-worker, Bruce Mabis, testified as follows regarding BOC/Airco:

> Q. During your welding career – and I'd like for you to focus on, as best you can remember, the jobs you worked with Curt – did you use any welding rods manufactured by any of those companies?
> A. Yes.
> Q. Which ones?
> A. At one time or another, I'd have to say all of them.
> Q. Okay. All of them, and that would mean Lincoln, Hobart, ESAB, and Airco?
> A. Yes.[275]
> . . .
> Q. Do you know for sure that you used rods manufactured by the others; Hobart,

---

[272] *See* trial tr. at 1524:17-21, 1524:24-25.

[273] *See* trial tr. at 800:2-16.

[274] *See* trial tr. at 808:23.

[275] *See* trial tr. at 695:5-14.

ESAB, and Airco?

A.    Yes, I do.

Q.    And do you know for sure that you used those products when you worked on jobs with Curt?

A.    Well, no, I can't say that.  I'd be guessing.[276]

Mr. Mabis also testified that he and Cooley typically worked long hours and overtime, although the time frame he was referencing was unclear:

Q.    . . . Mr. Mabis, continuing on to your jobs with Curt, as best you can recall, what was the typical work week like when you worked on jobs with Curt Cooley?

A.    Oh, well, it seemed like we were always on overtime jobs.  We worked a lot of seven-day weeks.

Q.    How many hours a day?

A.    Anywhere between 10 and 12.[277]

### c.    Industrial Hygienists' Testimony

Cooley's expert industrial hygienist, David Kahane, opined that "there's no question in my mind that Cooley was overexposed [to manganese] above 0.2 [TLV] during his career for sure."[278] Defendants' medical expert, Dr. Watts, testified there is no known safe level of exposure to manganese, and that damage due to exposure is cumulative.[279]

BOC notes that, on cross-examination, Mr. Kahane could not say Cooley's exposure exceeded the TLV of 0.2 mg/m$^3$ during the time period between 1979 and 1985, based on the number of hours worked provided by defense counsel.[280]  BOC also contends defendants' expert

---

[276]  *See* trial tr. at 696:3-8.

[277]  *See* trial tr. at 698:24-699:5.

[278]  *See* trial tr. at 1523:22-24.

[279]  *See* trial tr. at 2533:1-2534:1.

[280]  *See* trial tr. at 1591:13-1594:19.

industrial hygienist, Frederick Boelter, "provided uncontroverted evidence that a welder welding outside will not exceed any exposure limits."[281]  But Mr. Boelter testified on re-direct examination simply as follows:

> Q.     If a welder is welding outside, is he necessarily going to be exceeding any exposure limits?
> A.     No.
> Q.     Are welders able to, when working outside, able to get ventilation?
> A.     Yes.[282]

In other words, Mr. Boelter testified only to the unremarkable proposition that welding outside does not *automatically* cause *over-exposure*.

### 3.        Analysis of Causation

Upon full review of the evidence adduced at trial relating to Cooley's use of BOC's products, and considering this evidence in the light and with all reasonable inferences most favorable to Cooley, the Court finds substantial evidence to support the jury's conclusion that BOC's product was a substantial factor in causing Cooley's injury.

While BOC attempts to winnow down Cooley's testimony regarding BOC to a six-month period in 1981 when Cooley was working at J&J Steel, Cooley and Mabis support a broader accounting of his exposure to BOC's product.  BOC devotes a great deal of attention to Cooley's anecdote recalling the foreman who placed a box of BOC welding rods on blueprints so they would not blow away in the wind during the J&J Steel job.  In context, however, the jury was entitled to interpret this story as Cooley providing one example of why he remembers using BOC's welding rods during that period of his career.  Indeed, the jury could reasonably interpret the story as

---

[281]  *See* BOC's Motion for judgment as a matter of law, docket no. 256 at 4-5.

[282]  *See* trial tr. at 2103:15-20.

bolstering the accuracy of Cooley's recollection that he used BOC's welding rods on various different jobs during the preapprentice and apprentice period of his career.  As BOC notes in its motion, Cooley testified he did not work exclusively for J&J Steel while he was doing contract work for the company.[283]  Although BOC uses this fact to support the argument that Cooley did not do much welding for J&J Steel, there was substantial evidence from which the jury could conclude that Cooley used BOC's welding rods at various jobs, not just in his work for J&J Steel.

The same logical fallacy applies to how much welding Cooley did during that period of his career.  Cooley's story about one foreman on one job who had him doing a lot of rigging (as opposed to welding), does not undermine the jury's conclusion – based on direct testimony from Cooley – that "when [he] was a preapprentice, [he] welded a lot."[284]  In addition, the jury heard evidence that there is no known safe level of exposure to manganese, and damage due to exposure is cumulative.[285]  In sum, all of the testimony relating to Cooley's exposure to welding fumes provided the jury with substantial evidence to support the conclusion that Cooley was overexposed during the portion of his career when he was using BOC's product.

In this regard, it is worth noting the Court charged the jury regarding its obligation to weigh the evidence against each defendant individually.  For example, the Court instructed the jury that "[e]ach of the plaintiffs' claims against each defendant is separate," and "[y]ou must consider each claim separately and individually, and also consider each defendant separately and individually."  Further, in connection with proximate cause, the Court instructed that, where there are multiple

---

[283] *See* trial tr. at 812:22-813:2.

[284] Trial tr. at 808:23.

[285] *See* trial tr. at 2533:1-2534:1.

defendants, "the fault of each party may be a proximate cause, provided the fault of each substantially contributes to the plaintiff's injuries. 'Substantial' means the party's fault has such an effect in producing the damage as to lead a reasonable person to regard it as a cause." These instructions directed the jury to examine and assess BOC's individual conduct individually, and not simply as a part of the defendants' overall conduct.

Iowa's substantial factor analysis asks whether it would be "particularly unnatural or unreasonable" to find a nexus between Cooley's injury and BOC's negligence.[286] The Iowa Supreme Court has explained, in asbestos cases, that "a reasonable inference of exposure to a defendant's asbestos-containing product, coupled with expert testimony regarding asbestos fiber drift and the cumulative effects of exposure to asbestos, is enough to prove proximate cause."[287] Here, for all of the reasons discussed above, the evidence was sufficient to support a reasonable inference of exposure to BOC's product. Presented with this constellation of facts, it was not unreasonable or unnatural for the jury to find a connection between Cooley's exposure to BOC's product and his injury.[288] Consequently, the evidence was sufficient to satisfy the Iowa "substantial factor" test for causation.[289]

---

[286]  *City of Cedar Falls*, 617 N.W.2d at 17.

[287]  *Beeman*, 496 N.W.2d at 254; *see also Huber v. Watson*, 568 N.W.2d 787, 790 (Iowa 1997) (quoting *Beeman*).

[288]  *See Beeman*, 496 N.W.2d at 254.

[289]  The facts in *Beeman* also support this conclusion.  In *Beeman*, the Iowa Supreme Court upheld the jury verdict even though the evidence indicated that plaintiff's exposure to defendant's asbestos product was very limited.  496 N.W.2d at 254.  BOC does *not* address *Beeman* or analyze any Iowa Supreme Court cases holding that the plaintiff's exposure was insufficient to satisfy the substantial factor test.  Indeed, the only case BOC discusses in which the court found in favor of the defendant is *Perrin*, 871 F.Supp. at 1095-96.  In *Perrin*, plaintiff alleged exposure to the defendant's product on a ship.  The only evidence that plaintiff was ever exposed to defendant's product,

-84-

For the foregoing reasons, BOC's renewed motion for judgment as a matter of law (docket no. 256), is **DENIED**.

## V.  DEFENDANTS' AIDING AND ABETTING MOTION

Count IX of Cooley's complaint alleges defendants "aided and abetted . . . the tortious failure to warn the Plaintiff and his employers of the health hazards of exposure to manganese in welding fumes."[290]  At trial, defendants collectively moved for judgment as a matter of law with respect to the aiding and abetting claim at the close of Cooley's case, and again at the close of all evidence.[291] The Court denied both requests.  Defendants have renewed their challenge to the aiding and abetting claim in the Rule 50(b) motion for judgment as a matter of law now pending before the Court.[292]

### A.  THE STANDARD FOR DEFENDANTS' AIDING AND ABETTING MOTION

The applicable standard for defendants' motion for judgment as a matter of law on Cooley's

---

however, was general testimony from shipyard workers that the product was used on ships.  *Id*. at 1096.  The Northern District of Iowa distinguished *Beeman* and *Spaur*, and held that the evidence was insufficient because it merely raised the possibility that plaintiff was exposed to defendant's product.  *Id*.  Cooley's testimony establishes that exposure to BOC's product was a reality, not a mere possibility.

[290]  First Amended Complaint, Count IX, ¶¶ 138-174.

[291]  *See* trial tr. at 1850:25-1851:21; docket no. 238.

[292]  Defendants' Renewed Motion for Judgment as a Matter of Law on Plaintiffs' Aiding and Abetting Claims, docket no. 257.  In their reply brief, docket no. 271, defendants assert that, in his brief in opposition, Cooley conceded judgment as a matter of law with respect to his aiding and abetting claims against all defendants except BOC.  This is incorrect.  Cooley accurately noted that, because BOC is the only defendant who renewed his Rule 50 motion with respect to all claims, BOC is "the one Defendant for which this Motion could theoretically be consequential."  (Br. in Opp'n, docket no. 265 at 1.)  In light of this procedural reality, Cooley informed the Court he would focus his opposition on BOC.  He did not, however, abandon his aiding and abetting claims against the other defendants, and couched his overarching response to each of defendants' arguments in terms of all defendants, not just BOC.  Accordingly, the Court will analyze this motion as it relates to all defendants, not just BOC.

aiding and abetting claims is the same as the standard articulated above for the defendants' punitive

damages and BOC's motion for judgment as a matter of law:  (1) Iowa law applies;[293] and (2) Iowa

courts apply the "substantial evidence" standard for judgment as a matter of law.  That is, judgment

as a matter of law is *not* appropriate if there is substantial evidence to support each element of the

plaintiff's claim.  Evidence is substantial if a jury could reasonably infer a fact from the evidence,

and the Court must construe the evidence in the light most favorable to the nonmoving party, even

if the evidence was contradicted.  Thus, the Court will afford Cooley every legitimate inference that

can be reasonably drawn from the evidence.  The Court must uphold the jury's verdict if reasonable

minds could disagree as to whether substantial evidence supported Cooley's aiding and abetting

claims.[294]

### B.    ANALYSIS OF DEFENDANTS' AIDING & ABETTING MOTION

### 1.    The Iowa Standard for Aiding & Abetting Claims

Iowa uses the standard set out in Restatement (Second) of Torts § 876(b) for aiding and

abetting claims.[295]  Section 876(b) provides:

> For harm resulting to a third person from the tortious conduct of another, one is
> subject to liability if he . . . knows that the other's conduct constitutes a breach of
> duty and gives substantial assistance or encouragement to the other so to conduct
> himself.[296]

---

[293]  *See Mannix*, 348 F.3d at 531.

[294]  *See St. Paul's Evangelical Luthern Church*, 766 N.W. 2d at 798; *Balmer*, 604 N.W.2d
at 640-41; *Top of Iowa Co-op.*, 608 N.W.2d at 466; *Woods*,  480 N.W.2d at 65 (citing *Larsen*, 300
N.W.2d at 283); *McClure*, 613 N.W.2d at 230; *Scroggins*, 560 N.W.2d at 566.

[295]  *See Reilly v. Anderson*, 727 N.W.2d 102, 107 (Iowa 2006); *Ezzone*, 525 N.W.2d at 398.

[296]  Restatement (Second) of Torts § 876(b) (1979).  *See In re Welding Fume Prods. Liab.
Litig.*, 2010 WL 2403355 at *6-7 (N.D. Ohio June 11, 2010) (discussing §876).

Iowa law also requires the plaintiff to show proximate cause: "If the encouragement or assistance is a substantial factor in causing the resulting tort, the one giving it is himself a tortfeasor and is responsible for the consequences of the other's act."[297]  In other words, since Cooley prevailed on his aiding and abetting claim against each defendant at trial, the jury has to have concluded: (1) each defendant knew the other's conduct constituted a breach of its duty to Cooley; (2) each defendant gave substantial assistance or encouragement to at least one other; and (3) such encouragement or assistance was a proximate cause of Cooley's injury.  If the record, construed in the light most favorable to Cooley and affording him all reasonable inferences, contains substantial evidence to support the jury's conclusions with respect to each of these elements, then defendants' aiding and abetting motion must be denied.

### 2. Analysis of Defendants' Aiding & Abetting Motion

Predictably, the parties have very different views regarding the evidence relevant to the aiding and abetting motion.  Defendants characterize the evidence very narrowly, while Cooley takes a broader view.  Specifically, defendants argue Cooley has pointed to only three items that could possibly support the jury's aiding and abetting verdict: (1) the 1967 AWS publication that did not disclose the risks of welding fume exposure; (2) the industry's adoption of the 1967 warning label; and (3) the "Pocket Guide" and article called "Welding and Cutting Fumes" distributed to welders and their employers.  Defendants contend these three items are the only ones that reflect collective action, and they do not rise to the level of substantial evidence sufficient to support the elements of aiding and abetting, including proximate cause.  In contrast, Cooley points to a wider array of proof, arguing that all of the historical evidence of concerted action on the part of the welding consumables

---

[297] *Reilly*, 727 N.W.2d at 107 (quoting § 876 cmt. d).

industry combines to satisfy the substantial evidence standard as to each element of aiding and abetting.

Cooley's argument more accurately reflects the record before the Court. The evidence relating to defendants' conduct with respect to knowledge of the risks associated with manganese in welding fumes, the warnings they used, and their approach to managing the risks associated with their products, is described at length in the punitive damages section above. This evidence must be construed, and all reasonable inferences drawn, in the light most favorable to Cooley. Considering all of the evidence,[298] a reasonable jury could find:

- Each defendant understood that permanent neurological damage was a risk associated with manganese in welding fumes prior to the inception of Cooley's welding career;[299]

- Each defendant participated in industry trade group meetings in which the question of how to manage the health risks associated with welding fumes was discussed on an ongoing basis;[300]

- These meetings engendered concerted and collective action in the industry, including adoption of the inadequate, mandatory, industry-wide warning label in 1967, and agreement that the industry would distribute information intended to minimize customers' concerns regarding the new warning label;[301]

---

[298]   The pertinent evidence is summarized above in the punitive damages section, pages 19-38. In addition, the Court's more extensive summary of the evidence in *Jowers* is instructive on this issue. *See Jowers*, 608 F.Supp.2d at 752-755.

[299]   *See, e.g.*, trial tr. at 932-935; NEMA, Electric Welding Section meeting minutes at 135, discussing MetLife Booklet (Jan. 20, 1938) (plaintiff's trial exh. 140); BOC internal memorandum, quoting MetLife Booklet (plaintiff's trial exh. 197); *see also* trial tr. at 627:18-634:20 (discussing the Booklet and NEMA meeting with Lincoln's corporate representative).

[300]   *See, e.g.*, Minutes of AWS Committee on Filler Metals meeting attended by representatives from each defendant discussing industry-wide adoption of a warning label (June 8, 1966) (plaintiff's trial exh. 362).

[301]   *See, e.g.*, trial tr. at 945:1-21 (discussing defendants' publication of the article "Welding Industry to Use Caution Label on Filler Metal Packages"); Airco cover memorandum to distributors introducing the article "Welding Industry to Use Caution Label on Filler Metal Packages" (July 16,

- Before and during Cooley's welding career, each defendant knew of and adopted the "anti-warnings" approach to communicating about the risks of manganese in welding fumes;[302]

- As a result of defendants' concerted activity, each in support of the others, welders, including Cooley, mistakenly believed for decades that permanent neurological injury was *not* a risk associated with exposure to welding fumes;[303]

- Because of his mistaken belief, Cooley did not fully understand the appropriate precautions to take in order to avoid overexposure to welding fumes.

The Court acknowledges defendants plausibly rebut some of these conclusions.  However, it is not the province of the Court to determine whose evidence is stronger; its task is limited to deciding whether the jury's verdict is based on substantial evidence.

There are three elements of aiding and abetting in Iowa pertinent to this motion: (1) knowledge of the breach of a duty to the plaintiff by another; (2) substantial assistance or encouragement *vis a vis* that breach; and (3) that the substantial assistance or encouragement is a substantial factor causing the injury to the plaintiff.[304]  The Court clearly informed the jury of these elements in the jury instructions.[305]

---

1968) (plaintiff's trial exh. 1701); *see also* trial tr. at 948:2-949:1.

[302] *See, e.g.*, testimony of plaintiff's expert Dr. Cunitz (trial tr. at 942:5-949:1 discussing "Welding Hazards:  Our Modern Day Mythology" (plaintiff's trial exh. 230), Lincoln's Handbook (plaintiff's trial exh. 487), a reprinted article by Clyde Clason entitled "Welding and Cutting Fumes" (plaintiff's trial exh. 218)).

[303] *See, e.g.*, testimony of plaintiff's expert Dr. Cunitz, trial tr. at 947 (testifying that it would be reasonable for a welder to believe information supplied by manufacturers and employers regarding the hazards of welding); *see also* trial tr. at 2953:4-2954:10 (co-worker of Cooley testifying that in 2003 and still today he does not know that manganese in welding fume can cause brain damage).

[304] *See Reilly*, 727 N.W.2d at 107.

[305] Trial tr. at 3301:1-3302:3.

The record contains substantial evidence to support the knowledge element.  As discussed above, there was substantial evidence from which the jury could find defendants knew of the risk of permanent neurological injury as a result of overexposure to manganese in welding fumes by the 1940s.  This gave rise to a duty to warn consumers.  Thus, it was incumbent upon each defendant to provide an adequate warning with its products. And each defendant knew the others' warning practices, not only as a natural result of operating in the same industry, but also in light of the ongoing specific discussion of warnings at AWS meetings and in other communications.  Each defendant agreed, many times, to use standardized warning language.  Consequently, each defendant knew the others were not warning welders of the risks associated with overexposure to manganese in welding fumes.

The second element is "substantial assistance or encouragement."  The issue is whether each defendant provided another with substantial assistance or encouragement in breaching the duty to warn welders about manganese.  This element is the essence of an aiding and abetting claim.

Defendants argue the evidence illustrates, at most, parallel conduct – that is, each defendant, acting *independently*, chose not to warn welders, but did not "force, pressure, or induce" any other defendant not to warn.  In support of this argument, defendants correctly note that Iowa law requires more than mere presence during the commission of a tort to constitute aiding and abetting.[306]  For example, participation in a trade group cannot, alone, support an aiding and abetting claim.[307] Likewise, failure to act to prevent a tort is not, in and of itself, aiding and abetting.[308]  Defendants

---

[306] *See Heick*, 561 N.W.2d at 53.

[307] *See Wright v. Brooke Group Ltd.*, 652 N.W.2d 159, 174 (Iowa 2002)

[308] *See Heick*, 561 N.W.2d at 53.

argue Cooley established only that each defendant was a member of AWS and attended meetings relating to adoption of the 1967 warning label, nothing more.  In addition, they argue, Cooley presented no evidence that any defendant took an active role in AWS's decision to publish the 1967 article, which did not fully disclose risks associated with welding fume exposure.  Defendants also argue BOC's blanket distribution to its customers of publications – namely, its "Pocket Guide" and "Welding and Cutting Fumes" document – minimizing the risks associated with overexposure to welding fumes is not evidence of aiding and abetting.  As they put it, Cooley has "not presented any evidence that any one defendant took affirmative steps to pressure or induce the others to adopt an inadequate warning."[309]

Cooley responds correctly that the standard is whether the defendant *provided substantial assistance or encouragement*, not whether it "forced, pressured, or induced" another to act.  He also notes that Iowa law has adopted the Restatement (Second) of Torts approach, and treats aiding and abetting as a 'more specific theory' within § 876, 'concert of action.'[310] Cooley quotes comment d of § 876: "Advice or encouragement to act operates as a moral support to a tortfeasor and if the act encouraged is known to be tortious it has the same effect upon the liability of the advisor as participation or physical assistance."[311]  Cooley asserts the record contains substantial evidence indicating defendants attempted to use AWS and similar organizations to *work together* and build a consensus approach to warnings in the industry, and succeeded to the extent they adopted a single, mandatory, industry-wide warning.  Specifically, he points to the collection of memoranda and

---

[309]  Defendants' renewed motion for judgment as a matter of law on aiding and abetting claims, docket no. 257 at 9.

[310]  *See Reilly*, 727 N.W.2d at 108.

[311]  Restatement (Second) of Torts § 876 cmt. d.

documents discussing the industry-wide warning label and the expressed belief that a "united front" was necessary, because it would be commercially damaging for any single defendant-manufacturer to use a weaker label than its competitors.[312]  He also argues that BOC, as the industry leader, used its position to spearhead the drafting of the 1967 industry-wide warning label and persuade ANSI to approve it, to the benefit, and with the encouragement, of the other defendants.  Similarly, he argues, BOC spearheaded the industry's concerted anti-warnings campaign by distributing, e.g., the misleading Pocket Guide reprinting the industry-sponsored article, "Industry to Use Caution Label" and the "Welding and Cutting Fumes" article.  Cooley notes that, while trade group membership *alone* is not sufficient proof of an aiding and abetting claim, defendants are equally wrong to argue that such membership is only and always meaningless evidence of parallel conduct.

Consistent with Iowa law, this Court has already observed in another case that aiding and abetting requires "*affirmative* assistance or encouragement."[313]  Thus, while the Restatement's "substantial assistance or encouragement" requirement is not synonymous with "forc[ing], pressur[ing] or induc[ing]," it does demand an affirmative act of some kind.  The Restatement indicates, however, that the affirmative act of encouragement includes advice and even solidarity

---

[312]  Br. in Opp'n, docket no. 265 at 4-5 (citing Airco/BOC memorandum from I. Yates to F. Saake at 1 (Oct. 25, 1949); Airco/BOC memorandum from John J. Crowe to E.H. Roper (Sept. 5, 1950); Airco/BOC memorandum from F. Saake to members of Safe Practices Committee (Dec. 1950); and Airco/BOC memorandum from J. Crowe to E. Cosden (Dec. 7, 1950) and quoting trial tr. at 2192:1-6).

[313]  *In re Welding Fume Prods. Liab. Litig.*, 526 F.Supp.2d 775, 807 (N.D. Ohio 2007) ("For [aiding and abetting] liability to attach, the defendant must provide affirmative assistance or encouragement, and not merely fail to prevent the tortious act.  Mere knowledge that a tort is being committed and the failure to prevent it does not constitute aiding and abetting."); *see Heick*, 561 N.W.2d at 53.

– that is, it includes independent actions that are consistent with a common plan.[314]

*Heick* illustrates the parameters of substantial assistance or encouragement.[315]  In *Heick*, the issue was whether a passenger aided and abetted a drunk driver's negligence.  The Iowa Supreme Court found substantial assistance or encouragement lacking because the defendant did not facilitate the driver's decision to drive drunk or encourage him to do so.[316]  The defendant merely drank with him and was a passenger in his car.[317]  Importantly, although the defendant and the driver had a common plan to drive from bar to bar and drink alcohol together, there was no evidence they made a plan for the driver to drive when he was drunk or violate traffic laws, which was the tortious activity at issue.

*Ezzone*, in contrast, illustrates the Iowa Supreme Court's reluctance to overturn a jury's finding of aiding and abetting liability when there is substantial evidence of a close business relationship that leads to tortious conduct.[318]  In *Ezzone*, the plaintiffs were business owners who claimed their financial manager destroyed their company.  The plaintiffs also claimed the financial manager's actions were aided and abetted by three different banks.  The plaintiffs prevailed on all

---

[314]  Restatement (Second) of Torts § 876 cmt. d and Illustration 6.

[315]  *Heick*, 561 N.W.2d 45.

[316]  *Id*. at 53.

[317]  *Id*.

[318]  *Ezzone v. Riccardi*, 525 N.W.2d 388 (Iowa 1994).  After a jury found in favor of plaintiffs on all claims, including aiding and abetting, the *Ezzone* court observed: "Defendants' view, even though supported by considerable evidence, was rejected by the jury.  The jury subscribed to plaintiffs' factual contentions, contentions that clearly would have been rejected by many fact finders.  Because we cannot say there is no substantial evidence supporting plaintiffs' claims, and because the case was submitted on instructions without objections by defendants trial counsel, we affirm the findings of liability and compensatory damages."

of their claims, including the claim that the banks aided and abetted the financial manager's tortious interference with contract, conversion, and breach of confidential relationship.  Although the Iowa Supreme Court concluded there was "strong evidence" in support of the banks' insistence that they were innocent financial supporters, the Court also concluded there was "sufficient evidence" to support the plaintiffs' "sinister view."[319]  This evidence included the banks' close relationship with the financial manager, their knowledge of the company's financial and ownership interests, and constructive knowledge of the manager's level of actual authority.[320]

Here, there is substantial evidence from which a jury could reasonably conclude defendants worked together at AWS meetings to devise a common plan to provide inadequate warnings to welders about the risks associated with manganese in welding fumes.  Defendants argue the evidence only supports the conclusion that defendants were active members of AWS.  But defendants served on AWS committees and attended meetings the express purpose of which was to design an industry-wide approach to the warning label.  The result of those meetings was a warning label that each defendant used and that the jury found inadequate. In addition, the jury could reasonably conclude that part of this industry-wide approach was the creation and distribution of publications minimizing the risks of welding fumes to mitigate concerns regarding the new warning label.  Accordingly, Cooley has presented substantial evidence in support of "substantial assistance or encouragement," the second element of aiding and abetting.  As in *Ezzone*, the fact that a jury could have reasonably concluded otherwise is not controlling.

---

[319]  *Id.* at 394.

[320]  *Id*. at 391-94, 398.  *See also PFS Distribution v. Raduechel*, 492 F. Supp. 2d 1061, 1084 (S.D. Iowa 2007) (denying summary judgment on aiding and abetting claims based on material issues of fact regarding financial institutions' knowledge of clients' tortious activity), *aff'd* 574 F.3d 580, 595 (8th Cir. 2009).

The last element of aiding and abetting is proximate cause, or, in Iowa, the substantial factor analysis.[321]  As discussed above in the section relating to BOC's motion for judgment as a matter of law, the substantial factor analysis asks whether "the connection between the negligence and the injury appears unnatural, unreasonable, and improbable in the light of common experience."[322]  In the aiding and abetting context, the issue is whether, construing the evidence in the light and with all reasonable inferences most favorable to Cooley, each defendant's substantial assistance or encouragement to the others was a substantial factor in causing Cooley's injury.  Based on the above discussion regarding defendants' collaborative effort to design and implement an industry-wide approach to warnings and the associated anti-warnings campaign, a jury could reasonably find substantial evidence of causation.  It would not be unnatural, unreasonable, or improbable, in light of common experience, for the jury to conclude defendants substantially assisted or encouraged one another *vis a vis* each defendant's inadequate warning.  Based on the evidence, the jury could reasonably conclude that the conduct of each defendant worked to abet every other defendant's failure to adequately warn Cooley.

Accordingly, construing the facts and all reasonable inferences in the light most favorable to Cooley, the Court finds substantial evidence to support each element of Cooley's aiding and abetting claim.  Defendants' renewed motion for judgment as a matter of law on Cooley's aiding and abetting claims, docket no. 257, is **DENIED**.

## VI.  COOLEY'S MOTION FOR COSTS

The final substantive post-judgment motion is plaintiff's motion to tax costs (docket no.

---

[321] *See supra* for a discussion of the substantial factor causation analysis under Iowa law.

[322] *City of Cedar Falls*, 617 N.W.2d at 17 (omitting citations and quotations).

-95-

253), filed pursuant to Rule 54(d)(1) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1920.

Cooley requests costs in the amount of $62,551.73.

### A.    APPLICABLE LAW REGARDING TAXATION OF COSTS

Cooley's motion to tax costs is premised on the undisputed fact that he is the prevailing party

in this litigation.

### 1.    Law Governing Taxation of Costs

Rule 54(d)(1) of the Federal Rules of Civil Procedure provides that, "[u]nless a federal

statute, these rules, or a court order provides otherwise, costs – other than attorney's fees – *should*

*be* allowed to the prevailing party" (emphasis added).  Under 28 U.S.C. § 1920, the court may tax

the following items as "costs:"

1. Fees of the clerk and marshal;
2. Fees for printed or electronically recorded deposition and trial transcripts necessarily obtained for use in the case;
3. Fees and disbursements for printing and witnesses;
4. Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;
5. Docket fees under section 1923 of this title; and
6. Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

Rule 54(d)(1) creates a presumption in favor of awarding costs to the prevailing party, but the

Court's authority to award costs is confined to the items listed above.[323]  In addition, Cooley has the

burden of proving that the costs he is seeking fall within one of the categories listed above.  The

---

[323] *See White & White v. Am. Hosp. Supply Corp.*, 786 F.2d 728, 731-32 (6th Cir. 1986) ("[Rule 54(d)(1)] establishes a norm of action: prevailing parties are entitled to their costs as of course.  Departures from the rule are permitted; however, when rules prescribe a course of action as the norm but allow the district court to deviate from it, the court's discretion is more limited than it would be if the rule were nondirective." (omitting internal quotations)); *see also Delta Air Lines, Inc. v. August*, 450 U.S. 346, 352 (1981) (stating that "liability for costs is a normal incident of defeat").

Court "may not award costs until it has determined that the expenses sought to be taxed as costs were for material or services necessarily obtained for use in the case and in an amount that is reasonable."[324]

Defendants, who have objected to the payment of costs, bear the burden of proving circumstances sufficient to overcome the presumption in favor of an award of costs.[325]  The Sixth Circuit has explained that the Court may use its discretion to deny costs to the prevailing party when "it would be inequitable *under all the circumstances in the case* to put the burden of costs on the losing party."[326]  Examples of circumstances that may justify denial of costs includes cases in which (1) the taxable costs are "unnecessary or unreasonably large;" (2) "the prevailing party should be penalized for unnecessarily prolonging trial or for injecting unmeritorious issues;" (3) "the prevailing party's recovery is so insignificant that the judgment amounts to a victory for defendant;" and (4) the litigation is "close and difficult."[327]  Other non-dispositive factors include the good faith of the losing party and the "propriety with which the losing party conducts the litigation."[328]

### 2.  Timing: Whether the Motion for Costs Should Be Held in Abeyance until the Appeals Process Is Completed

Defendants' first objection is a procedural one.  They argue it is premature to rule on a

---

[324] *Aubin Indus., Inc. v. Smith*, 2009 U.S. Dist. LEXIS 55104, at *4-5 (S.D. Ohio June 15, 2009).

[325] *See Johnson v. Cleveland City School Dist.*, 2009 WL 275468 at *2 (N.D. Ohio Feb. 4, 2009) (citing *White & White*, 786 F.2d at 732).

[326] *White & White*, 786 F.2d at 730 (quoting *Lichter Found., Inc. v. Welch*, 269 F.2d 142, 146 (6th Cir. 1959) (emphasis in original).

[327] *Id*.

[328] *Id*.

-97-

motion for costs when the underlying judgment is on appeal.  As the case law cited in the parties' briefs demonstrates, whether to delay ruling on costs pending appeal is within the discretion of the Court.[329]  As Cooley correctly notes, other courts within the Northern District of Ohio have chosen to rule on a motion for costs before or during the pendency of the appeal.[330]  Furthermore, the policy of preventing piecemeal litigation does not necessarily favor delaying the ruling on the motion for costs – if the losing party appeals the costs award, delay has likely *caused* piecemeal litigation. Here, it is most efficient for the Court to resolve this motion along with the punitive damages and attorneys' fees motion, resolving all post-judgment issues relating to defendants' damages liability in one order.  The Court finds that ruling on the motion for costs now is the better course.

### B.    TAXATION OF COSTS ANALYSIS

#### 1.    Arguments

Defendants argue the Court should deny Cooley's motion to tax costs for three reasons: (1) defendants litigated this case in good faith; (2) this was a close and difficult case; and (3) Cooley is seeking costs that are unreasonable and unnecessary.  In *White & White*, the Sixth Circuit listed each of these reasons as potential circumstances justifying a finding that, under all the circumstances of the case, it would be inequitable to saddle the losing party with costs.[331]  In this case, defendants' assertions are not sufficient to rebut the presumption in favor of awarding costs.

Defendants did litigate this case in good faith.  And this case, like all of the bellwether trials

---

[329] *See* defendants' opposition to motion to tax costs, docket no. 261 at 3; plaintiff's reply, docket no. 268 at 2-4.

[330] *See Nye v. CSX Transp., Inc.*, 2005 WL 1126754, at *1 (N.D. Ohio Apr. 26, 2005); *Ho-A-Lim v. Cuyahoga Community College*, 2009 WL 2382017, at *2 (N.D. Ohio July 31, 2009).

[331] *White & White*, 786 F.2d at 730.

in this MDL, could be described as "close and difficult."  These circumstances, however, do not set this case apart from the vast majority of civil cases that proceed to trial.  If defendants' good faith and the fact that this was fiercely litigated by both sides were sufficient to deny Cooley's motion for costs, then the exception to Rule 54(d)(1) would swallow the rule.  Good faith in a close and difficult case only justifies denying costs in unusual cases,[332] and defendants have not shown this case fits into that category.  In addition, although the Court addresses defendants' specific arguments regarding whether particular categories or line items fall within the limited confines of 28 U.S.C. § 1920, the Court finds the costs Cooley is seeking to tax are not "unreasonable and unnecessary." Further, the other *White & White* factors do not support defendants' arguments.  Cooley did not unnecessarily prolong the litigation or raise unmeritorious issues, and his recovery was clearly significant.[333]

Accordingly, the Court rejects defendants' arguments that the motion to tax costs should be denied in its entirety.

### 2.    Arguments Regarding Particular Categories and Line Items

The defendants' also argue that the following five categories or line items are non-recoverable costs:  (1) trial technology costs; (2) daily trial transcripts; (3) printing, copying, and supplies; (4) depositions; and (5) legal research.  In his reply brief and amended bill of costs, Cooley withdrew his request for trial technology costs, as well as the costs defendants characterized as "legal research."  The objections to these two categories of costs are, therefore, moot.[334]

---

[332]  *See*, *e.g.*, *id.* (involving a complex antitrust trial that lasted for months).

[333]  *White & White*, 786 F.2d at 730.

[334]  Cooley notes in his reply brief that he is not conceding that these costs are non-recoverable, and he reserves his right to request such costs as a component of attorneys' fees in the

### a.  Daily Trial Transcripts

Cooley requests $24,676.25 for "Official Court Reporter Fees for Trial."[335]  A substantial portion of that amount is for daily trial transcripts.  It is undisputed that § 1920(2) permits the Court to award costs for court reporter fees for preparing a transcript, but only if the transcript is necessarily obtained for use in the case.[336]  "Necessarily obtained for use in the case" does not mean that the transcript is "indispensable," but it must be "necessary to counsel's effective performance or the court's handling of the case."[337]  In many cases, daily trial transcripts would be a convenience rather than a necessity.  In bellwether trials in this MDL, daily transcripts serve an important function given the length of the trial, the complexity of issues, and the need for the Court to provide timely and consistent rulings on recurring procedural and evidentiary issues.  Indeed, defendants relied heavily on daily transcripts during the trial.

The Court finds the requested costs for daily trial transcripts reasonable and necessary under the circumstances of this case, and awards **$24,676.25** for the cost of trial transcripts.

### b.  Printing, Copying, and Supplies

Defendants argue Cooley failed to adequately support his request for costs relating to printing, copying, and supplies.  "The costs of photocopying documents necessarily obtained for use

future.

[335] *See* Plaintiff's Amended Bill of Costs, docket no. 268-1.

[336] 28 U.S.C. § 1920(2); *see also Tharo Sys., Inc. v. Cab Produckttechnik*, 2005 WL 1123595 at *3 (N.D. Ohio May 10, 2005).

[337] *Burton v. R.J. Reynolds Tobacco, Co.*, 395 F.Supp.2d 1065, 1078-79 (D. Kan. Oct. 20, 2005) (citing 10 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure*, § 2677 at 438-40, 3d ed. 1998)).

in a case are taxable under § 1920(4)."[338]  Photocopies are necessary to the extent they "were used as court exhibits or were furnished to the Court or the opposing counsel."[339]  Cooley bears the burden of establishing necessity.[340]

Cooley's initial bill of costs did not provide sufficient detail to establish necessity for each item in this category.  His amended bill of costs, however, cures this defect.  For each entry, the amended bill of costs provides a brief description of the purpose of the printing or copying expense, and the invoices are attached as exhibits.  These submissions establish that Cooley is only seeking recovery of costs related to copies for use at trial, deposition designations, exhibits, demonstrative exhibits, and jury exhibit binders.  Furthermore, the total amount requested – $4,071.94 – is not unreasonable considering this was a long, document-intensive trial.

Accordingly, the Court finds the requested costs for printing, copying, and supplies are reasonable and necessary under the circumstances of this case.  The Court awards **$4,071.94** for the cost of printing, copying and supplies.

### c.    **Depositions**

Defendants object to the amount requested for deposition costs to the extent it includes "overhead charges" related to postage, shipping, and handling.  Defendants also point out several line items that appear duplicative.  "There is no question that deposition expenses may be taxed as

---

[338]  *Wilhelm v. CSX Transp., Inc.*, 2005 WL 361482 at *1 (N.D. Ohio Feb. 14, 2005).

[339]  *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 684 F.Supp. 953, 961 (N.D. Ohio 1988).

[340]  *Hartford Fin. Servs. Group v. Cleveland Public Library*, 2007 U.S. Dist. LEXIS 22528 at *18-19 (N.D. Ohio Mar. 28, 2007).

costs" under 28 U.S.C. § 1920(2).[341]  While the parties dispute whether the cost of postage, shipping, and handling should be included in recoverable deposition costs, the Court need not decide this issue because Cooley withdrew his request for such costs in his reply brief and amended bill of costs. Therefore, this objection is moot.  In addition, having reviewed the amended deposition costs, the Court finds Cooley removed the duplicative copies of Dr. McAlister's deposition.

The amended bill of costs does not, however, include an invoice for, or explain the basis of, the three items described as "Other Transcripts" on page 3 of the Amended Bill of Costs.[342] Therefore, the Court will subtract these costs from the total request and only award **$32,216.60** for the cost of depositions.

###### C.    AWARD

Cooley's motion to tax costs, docket no. 253, is **GRANTED** to the extent described above. Pursuant to Rule 54(d)(1) and 28 U.S.C. § 1920, the Court **AWARDS** Cooley **$60,964.79** in costs.

---

[341]  *Johnson* 2009 WL 275468 at *3 (citing *Sales v. Marshall*, 873 F.2d 115, 120 (6th Cir. 1989)).

[342]  *See* docket no. 268-1 at 3.

V.      **CONCLUSION**

For all of the foregoing reasons, the Court **ORDERS** as follows:

•       Defendants' Renewed Motion for Judgment as a Matter of Law on Plaintiffs' Punitive Damages Claim or, in the alternative, for Reduction of the Punitive Damages Awards (docket no. 258) is **DENIED**;

•       Plaintiff's Motion for Attorneys' Fees and Expenses (docket no. 255) is **DENIED**;

•       Defendants' Motion for Leave to File Surreply (docket no. 269) is **DENIED AS MOOT**;

•       Defendants' Renewed Motion for Judgment as a Matter of Law on Plaintiffs' Aiding and Abetting Claims (docket no. 257) is **DENIED**;

•       Defendant BOC's Renewed Motion for Judgment as a Matter of Law (docket no. 256) is **DENIED**;

•       Plaintiff's Motion to Tax Costs (docket no. 253) is **GRANTED, in part**, and the Court **AWARDS $60,964.79** in costs to Cooley.

**IT IS SO ORDERED.**

/s/ Kathleen M. O'Malley
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED**: March 7, 2011